# United States Court of Appeals
## For the First Circuit

No. 18-1039

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID WRIGHT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Howard, Chief Judge,
Kayatta and Barron, Circuit Judges.

Michael Tumposky, with whom Jessica Hedges, James Haynes, Forest O'Neill-Greenberg, and Hedges & Tumposky, LLP were on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, and Pamela Gaulin, Harvard Law School, were on brief, for appellee.

August 28, 2019

**BARRON**, **Circuit Judge**.  Beginning sometime in 2014, David Wright, Nicholas Rovinski, and Usaamah Rahim -- Wright's uncle -- engaged in discussions about the Islamic State of Iraq and Syria ("ISIS"), which the United States has designated as a Foreign Terrorist Organization under § 219 of the Immigration and Nationality Act.  See 8 U.S.C. § 1189; 80 Fed. Reg. 58,804, 58,804 (Sept. 30, 2015).[1]  The discussions allegedly involved a "high-profile" ISIS spokesperson and concerned a plot to fulfill a fatwa (ISIS decree) issued by "ISIS leaders" to behead Pamela Geller -- an American citizen living in this country -- for insulting the Prophet Mohammed.  The discussions also concerned plans to kill police officers in the United States and to establish a "martyrdom" cell in this country.

Federal Bureau of Investigation ("FBI") agents electronically monitored the three men's communications, including through surveillance conducted pursuant to the Foreign Intelligence Surveillance Act ("FISA").  See 50 U.S.C. § 1801.  On June 2, 2015, after FBI agents intercepted a call between Rahim and Wright, they confronted Rahim at a bus stop.  Rahim then drew

---

[1] The Islamic State of Iraq and the Levant was officially designated as a Foreign Terrorist Organization in December 2004, but the Secretary of State amended its designation in September 2015 to reflect the fact "that the Islamic State of Iraq and the Levant uses the additional aliases the Islamic State, ISIL, and ISIS."  Id.  Both parties refer to the organization as "ISIS," so we do as well.

a thirteen-inch knife, which led the agents to shoot him when he refused to drop it. He died from his injuries.

Less than a month later, Wright was indicted for conspiracy to provide material support to ISIS, in violation of 18 U.S.C. §§ 2339B(a)(1)-(2) ("Count One"); conspiracy to obstruct justice, in violation of 18 U.S.C. § 371 ("Count Two"); and obstruction of justice, in violation of 18 U.S.C. §§ 1519 and 2 ("Count Three"). An April 2016 superseding indictment added a count for conspiracy to commit acts of terrorism transcending national boundaries, in violation of 18 U.S.C. §§ 2332b(a)(2) and (c) ("Count Four"); and another February 2017 superseding indictment added a count of obstruction of justice, in violation of 18 U.S.C. § 1519 ("Count Five").

Following a fourteen-day trial, the jury convicted Wright on all counts. The District Court sentenced Wright in December 2017 to twenty-eight years' imprisonment and lifetime supervised release. The District Court sentenced Wright to a total of twenty years' imprisonment on Counts One, Three, and Five, to be served concurrently with a sentence of five years' imprisonment on Count Two. The District Court sentenced Wright to eight years' imprisonment on Count Four to be served consecutively with the twenty-year prison sentence for Counts One, Two, Three, and Five.

- 3 -

Wright now appeals his convictions.  We affirm Wright's convictions on Counts Two through Five.  We vacate his conviction on Count One.

**I.**

We begin by considering Wright's challenges to the District Court's order that denied various pretrial motions to suppress evidence.  Wright does not make a clear argument as to how his challenge to the District Court's denial of each of these motions to suppress relates to each of his convictions.  Nevertheless, we proceed on the understanding that the evidence implicated in each motion would, if suppressed, affect his convictions on all counts.

"In reviewing a challenge to the district court's denial of a motion to suppress, we view the facts in the light most favorable to the district court's ruling, and review the district court's findings of fact and credibility determinations for clear error."  United States v. Peake, 804 F.3d 81, 86 (1st Cir. 2015) (internal quotation marks omitted).  We review legal issues, including preserved constitutional claims and a district court's determination of whether the government exceeded the scope of a warrant, de novo.  See id.; United States v. Brown, 669 F.3d 10, 19 (1st Cir. 2012); United States v. Volungus, 595 F.3d 1, 4 (1st Cir. 2010).

**A.**

We first address Wright's challenge to the District Court's denial of his motion to suppress the fruits or derivatives of any electronic surveillance that the FBI conducted pursuant to FISA. On appeal, Wright argues only that the District Court "should have suppressed the evidence obtained under FISA's emergency provision" (the "Emergency Provision") -- insofar as any evidence was so obtained -- "because that portion of the statute is unconstitutional or, in the alternative, must be construed narrowly."

**1.**

FISA is a federal statute. It establishes, as relevant here, a mechanism by which federal law enforcement officers may obtain a judicial order that authorizes the use of electronic surveillance within the United States when a "significant purpose" of the surveillance is the collection of "foreign intelligence information." 50 U.S.C. § 1804(a)(6)(B).

Typically, the process is initiated by the submission of an application, which must be approved by the Attorney General of the United States (the "Attorney General"), to the Foreign Intelligence Surveillance Court ("FISC") for review by one of its judges. Id. § 1804(a). In response to such an application, FISC judges may issue an ex parte order that authorizes electronic surveillance after making, among other things, a finding of

- 5 -

probable cause that the target of the surveillance is a foreign power or agent of a foreign power. Id. § 1805(a)(2).

Orders may approve surveillance that targets United States persons for up to ninety days. Id. § 1805(d)(1). Orders that approve surveillance that targets non-United States persons may do so for up to 120 days. Id.

The statute also includes an emergency authorization provision. See id. § 1805(e). The Emergency Provision permits the Attorney General to authorize electronic surveillance without prior judicial approval if the Attorney General "reasonably determines that an emergency situation exists with respect to the employment of surveillance to obtain foreign intelligence information before an order authorizing such surveillance can with due diligence be obtained" and there is a factual basis supporting issuance of an order. Id. § 1805(e)(1)(A)-(B). The Emergency Provision requires that the Attorney General inform the FISC of its decision to employ emergency surveillance and submit an application for a judicially approved order, from the FISC, pursuant to the regular procedure "as soon as practicable," but no later than seven days after the Attorney General grants the emergency authorization. Id. § 1805(e)(1)(D).

Information collected through surveillance that has been authorized by the Attorney General pursuant to the Emergency Provision can be used in certain "proceeding[s]." Id.

- 6 -

§ 1805(e)(5).  However, such information can be so used only "with the approval of the Attorney General if the information indicates a threat of death or serious bodily harm to any person."  Id.

**2.**

On June 12, 2015, the government filed a notice of intent "to offer into evidence, or otherwise use or disclose," as relevant here, "information obtained or derived from electronic surveillance . . . conducted pursuant to [FISA]."  The notice of intent made no reference to the Emergency Provision.

Wright thereafter filed a motion to compel discovery of evidence obtained pursuant to FISA.  The District Court denied the motion.  The District Court did so after concluding that FISA "seems to contemplate the filing of . . . an 'ill-informed motion to suppress.'"

Wright then filed a motion to disclose or suppress such evidence, in which he "renew[ed] and incorporate[d] by reference his motion to compel discovery."  In that motion, Wright identified a number of independent and alternative bases for suppression.

In support of his motion, Wright argued that FISA's general requirement that the acquisition of foreign intelligence information need only be a "significant purpose" of the search or surveillance -- and thus need not be the "primary purpose" -- renders searches and surveillance under that statute

- 7 -

violative of the First, Fourth, Fifth, and Sixth Amendments to the United States Constitution.  See 50 U.S.C. § 1804(a)(6)(B).

The government filed a memorandum in opposition to Wright's motion to suppress.  The memorandum provided an overview of the FISA surveillance process, which included a reference to the Emergency Provision.  The memorandum did not, however, indicate that the government had relied on the Emergency Provision.  Rather, the memorandum argued, in response to Wright's suppression motion, simply that the government had complied with FISA's requirements throughout its surveillance.  The memorandum also responded to Wright's federal constitutional argument concerning FISA's general "significant purpose" requirement, along with the other arguments for suppression that he had advanced, none of which, as we have noted, concerned the Emergency Provision.

The District Court held a status conference shortly after these filings were made, at which it asked the parties a series of general questions about FISA.  One of those questions was whether the Emergency Provision, as described in the government's memorandum, raised any federal constitutional issues. The District Court specifically stated, "I'm not talking about this case, I'm talking about generally."

Wright then filed a memorandum of law, in which he addressed the Emergency Provision.  Wright first contended that the Emergency Provision violated the Fourth Amendment.  He relied

on United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div., 407 U.S. 297 (1972) [hereinafter "Keith"], to contend that the Emergency Provision is constitutionally deficient because it does not require judicial approval of surveillance before it begins. See id. at 316-17 ("Fourth Amendment freedoms cannot properly be guaranteed if domestic security surveillances may be conducted solely within the discretion of the Executive Branch. The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates.").

Wright argued in the alternative that, to avoid constitutional problems, the Emergency Provision must be construed narrowly. With respect to that latter contention, Wright pointed out that, although Title III of the Omnibus Crime Control and Safe Streets Act, which authorizes surveillance without prior judicial approval in "emergency situation[s]," enumerates the specific "danger[s]" and "activities" that constitute an "emergency situation," see 18 U.S.C. § 2518(7)(a), FISA does not. Wright argued that the Emergency Provision should be construed to permit the Attorney General to authorize emergency surveillance without prior judicial approval only "when he has evidence that there is an imminent threat to life, where the surveillance would assist in the protection of that life, and where a warrant cannot be obtained in time to stop this imminent threat to life."

The government filed a response to Wright's memorandum concerning the Emergency Provision. The government argued that the Emergency Provision was constitutional. The government submitted, shortly after filing that response, ex parte filings of classified materials to the District Court.

The District Court denied Wright's motion. The District Court explained that its "de novo review reveal[ed] that the government attorneys here have throughout acted with scrupulous regard for the rights of the defendant Wright and have conducted themselves with utmost fidelity within the limited powers accorded them under [FISA]." The District Court stated that it did not "agree with each of the government's characterizations, especially their perception of the imminence of threat posed by the defendant Wright and his co-conspirators." Nonetheless, the District Court stated that it found that the "government attorneys ha[d] followed the established procedures" under FISA with "scrupulous care." The District Court thus concluded that "[t]here [was] here no basis to consider the suppression of evidence."

**3.**

On appeal, Wright abandons the argument that he made below that concerned FISA's general "significant purpose" requirement. We also agree with the government that Wright has waived for lack of development any argument that FISA surveillance in this case is unconstitutional because of the ex parte nature of

- 10 -

the surveillance authorization decisions under FISA, and the resulting inability of Wright to know which evidence, if any, was used to justify the initiation of any surveillance, or which, if any, evidence was obtained pursuant to any such surveillance. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Wright does not, for example, challenge the District Court's observation that the statute contemplates the filing of "an ill-informed motion to suppress." Rather, on appeal Wright raises only the two arguments that he raised below, first challenging the facial constitutionality of the Emergency Provision and, then, second, arguing that the provision "need be narrowly construed."

We thus start with Wright's contention on appeal that the Emergency Provision on its face violates the Fourth Amendment, because it permits electronic surveillance without prior judicial approval. In his brief to us on appeal, as in his memorandum below, Wright relies on Keith to advance that argument. In particular, Wright stresses that Keith holds that electronic surveillance in domestic security matters may require an appropriate ex ante warrant procedure. See Keith, 407 U.S. at 316-17.

But, Wright does not acknowledge that Keith expressly limits its holding to "only the domestic aspects of national security" or that Keith "express[es] no opinion as to [] the issues which may be involved with respect to activities of foreign powers

- 11 -

or their agents." Id. at 321-22, 324. Nor does Wright confront the fact that the United States Supreme Court has more recently characterized Keith as having "implicitly suggested that a special framework for foreign intelligence surveillance might be constitutionally permissible." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 402 (2013) (citing Keith, 407 U.S. at 322-23).

In addition, despite the facial nature of his challenge, Wright does not develop any argument that surveillance conducted pursuant to the Emergency Provision is unconstitutional no matter the circumstances involved, notwithstanding that, in ordinary law enforcement contexts, exigent circumstances may sometimes justify a warrantless search. See Kentucky v. King, 563 U.S. 452, 460 (2011) ("One well-recognized exception [to the warrant requirement] applies when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." (internal quotation marks omitted)). Yet, insofar as Wright means to bring a facial challenge to the Emergency Provision based on the mere fact that it permits the authorization of electronic surveillance without prior judicial approval, he must, as the government points out, explain why -- even in dire situations -- advance judicial approval is always required. See City of Los Angeles v. Patel, 135 S. Ct. 2443, 2450-51 (2015) (noting that the "proper inquiry" for "facial

challenges to statutes authorizing warrantless searches" is whether the "searches that the law actually authorizes" are "unconstitutional in all applications").

We note in this regard that Wright appears to acknowledge that there _are_ some exigent circumstances in which the authorization of electronic surveillance without prior judicial approval -- pursuant to the Emergency Provision or otherwise -- is constitutionally permissible. Wright argues, for example, that, to avoid constitutional problems, the Emergency Provision should be construed in the same narrow fashion that he contends that other emergency authorization statutes have been construed, such as the emergency provision in Title III, 18 U.S.C. § 2518(7)(a); see, e.g., _Nabozny_ v. _Marshall_, 781 F.2d 83, 85 (6th Cir. 1986); _United States_ v. _Capra_, 501 F.2d 267, 277 (2d Cir. 1974), and the emergency provision in the Stored Communications Act, 18 U.S.C. § 2702(b)(8); see, e.g., _In re Application of United States for a Nunc Pro Tunc Order for Disclosure of Telecomm. Records_, 352 F. Supp. 2d 45, 47 (D. Mass. 2005). Given these concessions that the Emergency Provision can be constitutionally applied in some circumstances, we reject Wright's Fourth Amendment-based facial challenge. See _Patel_, 135 S. Ct. at 2450-51.

Wright does appear to press an alternative argument. He contends that the Fourth Amendment requires that the Emergency Provision be construed to permit the Attorney General's emergency

- 13 -

authorization "power [to] be employed [only] in narrow circumstances." Specifically, he contends, as he did below, that the Emergency Provision would be constitutional only if the statutory phrase, "emergency situation," 50 U.S.C. § 1805(e)(1)(A), were construed to require "evidence that there is an imminent threat to life, where the surveillance would assist in the protection of that life, and where a warrant cannot be obtained in time to stop this imminent threat to life."

But, even assuming that the Emergency Provision must be so narrowly construed, notwithstanding that it authorizes the collection of foreign intelligence information, Wright makes no argument that the government could not have met this standard for an "emergency situation." He also makes no argument that any evidence traceable to the use of the emergency procedure in particular would have been prejudicial to him if not suppressed. Nor does he develop any argument as to why he should be excused from having to make such arguments. Indeed, as we have noted, Wright does not adequately develop a challenge to the District Court's conclusion that the statute encompasses the filing of "an ill-informed motion to suppress." Accordingly, we reject Wright's narrow-construction challenge, too. Zannino, 895 F.2d at 17; see also United States v. Mohamud, 843 F.3d 420, 438 n.21 (9th Cir. 2016) (declining to reach defendant's facial challenge to FISA for lack of explanation as to why suppression should be required in

- 14 -

his case); United States v. Posey, 864 F.2d 1487, 1491 (9th Cir.

1989) ("[W]e think it clear that appellant may not make a facial

challenge to the FISA without arguing that the particular

surveillance against him violated the Fourth Amendment . . . Even

if he is correct that the FISA's language might be applied in ways

that violate the Fourth Amendment, he must show that the particular

search in his case violated the Fourth Amendment.  Appellant cannot

invalidate his own conviction on the argument that others' rights

are threatened by FISA." (emphasis in original)).[2]

**B.**

We now turn to Wright's challenge to the portion of the

District Court's order that denied his motion to suppress evidence

obtained from the search of his electronic devices.  The relevant

facts, to which the parties agree, are as follows.

---

[2] Wright also points out that the FISA Emergency Provision permits the Attorney General to authorize warrantless surveillance for up to seven days, see 50 U.S.C. § 1805(e)(1)(D), whereas the analogous provision in Title III only authorizes warrantless surveillance for up to forty-eight hours, see 18 U.S.C. § 2518(7). Insofar as Wright means to argue that this "longer-term, warrantless wiretapping" violates the Fourth Amendment, Wright makes no argument that any evidence in his particular case was obtained pursuant to surveillance without judicial approval that was conducted for more than forty-eight hours or as to how he can bring a facial challenge to this aspect of the FISA Emergency Provision without making a showing that some evidence in his case was so obtained and was prejudicial to him.  See Mohamud, 843 F.3d at 438 n.21; Posey, 864 F.2d at 1491.  Nor does he argue that he was wrongly denied access to the information that might support such an argument.  Accordingly, we see no reason to address this aspect of Wright's facial challenge to the Emergency Provision.

During the early morning of June 3, 2015, an FBI agent filed an application for a search warrant for Wright's apartment. The affidavit that accompanied the application included two attachments. One of the attachments described Wright's apartment ("Attachment 2"). The other attachment identified the property subject to seizure ("Attachment A"). Attachment A included a list of specific "items," including "[a]ll computer hardware, computer software, gaming equipment, computer-related documentation, and storage media" and noted that "[o]ff-site searching of these items shall be limited to searching for the items described [previously]." (Emphasis added).

A federal magistrate judge issued a warrant based on the application. The Magistrate Judge identified the "property to be searched" in that warrant as Wright's apartment as described in Attachment 2 and the "property to be seized" as the property listed in Attachment A.

FBI agents seized Wright's electronic media devices pursuant to the warrant. The agents also later searched those media devices for evidence.

Wright argues that the plain text of the warrant precluded the search of the electronic media devices that were seized. This contention turns on the proper construction of the warrant, so our review is de novo. See Peake, 804 F.3d at 86.

- 16 -

We conclude that the warrant is most naturally read to contemplate the search of Wright's electronic devices after their seizure. See id. at 87 (explaining that "search warrants and affidavits should be considered in a common sense manner, and hypertechnical readings should be avoided" (internal quotation marks omitted)). The warrant expressly cross-references Attachment A in describing the property that may be seized. Attachment A, in turn, expressly provides for the "[o]ff-site searching of" electronic media devices. Thus, the warrant -- by virtue of its cross reference to Attachment A -- is best read to authorize not only the seizure, but also the search of the devices at issue, as expressly contemplated by the text of Attachment A. See United States v. Baldyga, 233 F.3d 674, 683 (1st Cir. 2000) As a result, Wright's contention that, in light of Riley v. California, 134 S. Ct. 2473 (2014), we may not infer that an authorization to seize an electronic device necessarily includes the authorization to search that device is beside the point.

### c.

Wright challenges one other portion of the District Court's order that denied his various motions to suppress. That portion of the order concerns Wright's motion to suppress statements that he made to law enforcement agents at his home on June 2, 2015.

Wright contends that the District Court erred by denying this motion to suppress, because the government violated his federal constitutional due process rights by failing to record the interview in which he made the statements. As the government notes, however, Wright cites no authority to support his alleged entitlement under the federal Constitution to a recorded interview. In fact, we have previously held to the contrary. See United States v. Meadows, 571 F.3d 131, 147 (1st Cir. 2009) ("[T]here is no federal constitutional right to have one's custodial interrogation recorded.").

Wright does attempt to ground his claim in a United States Department of Justice policy that requires the recording of custodial interviews conducted in a place of detention with suitable recording equipment. But, that policy does not purport to create legal rights that may be enforced by criminal defendants. See United States v. Craveiro, 907 F.2d 260, 264 (1st Cir. 1990) (holding that "the internal guidelines of a federal agency, that are not mandated by statute or the constitution, do not confer substantive rights on any party"). Thus, that policy supplies no basis for overturning the portion of the District Court's order that denied Wright's suppression motion with respect to the statements that he made to law enforcement.

We turn our attention now to Wright's challenge of the District Court's handling of an unplanned interaction that occurred between a juror and an FBI agent at a restaurant while the trial was ongoing. Here, too, Wright is less than clear in identifying the convictions to which this challenge pertains. We nonetheless proceed on the understanding that, like his challenges to the District Court's order denying his suppression motions, he means for this challenge to implicate each of his convictions.

While a district court must make an "adequate inquiry" into non-frivolous claims of juror bias or misconduct, United States v. Ortiz-Arrigoitia, 996 F.2d 436, 442 (1st Cir. 1993), the district court has "broad discretion to determine the type of investigation [that] must be mounted." United States v. Boylan, 898 F.3d 230, 258 (1st Cir. 1990). See also United States v. Ramirez-Rivera, 800 F.3d 1, 41 (1st Cir. 2015) ("[T]he trial judge is vested with the discretion to fashion an appropriate and responsible procedure to determine whether misconduct occurred and whether it was prejudicial.").

We review the adequacy of a district court's investigation of -- and response to -- evidence of potential juror bias or misconduct for abuse of discretion, "recogniz[ing] that the district court has wide discretion in deciding how to handle and how to respond to allegations of juror bias and misconduct

that arise during a trial." United States v. Tejeda, 481 F.3d 44, 52 (1st Cir. 2007) (internal quotation marks omitted).  We review a district court's findings that a juror is credible and that the jury is impartial for clear error.  See United States v. Burgos-Montes, 786 F.3d 92, 110-11 (1st Cir. 2015).

**A.**

The relevant facts, as found by the District Court, are as follows.  Juror 25 encountered one of the FBI agents who had been sitting at the government's counsel table during trial at a restaurant over a weekend while the trial was ongoing.  Juror 25 and the FBI agent exchanged pleasantries but did not discuss the case.

When the agent was ready to leave his table, wait staff informed him that someone had already paid for his meal.  Wait staff suggested to the agent that the person who had paid for his meal was sitting at a table in the restaurant other than the one at which Juror 25 had been seated.

The government informed the District Court of this matter on the Monday morning after the encounter.  Both parties agreed to the District Court's proposal to question Juror 25 about the incident.

The District Court questioned Juror 25 in the presence of the parties.  Juror 25 admitted to seeing the FBI agent and to exchanging pleasantries with him.  He stated that there was no

discussion of the substance of the case.  He also stated that he had paid the agent's bill and explained, after being asked why he had done so, that there was "no reason, we like to pay it forward, so he happened to be there and that's what we did."

Juror 25 also told the District Court that he had mentioned to about seven jurors that morning that he had seen the agent over the weekend.  He noted, however, that he did not tell any of those jurors that he had paid the agent's bill at the restaurant.  Juror 25 also stated that he had, pursuant to the District Court's instructions at the outset of the trial, not "expressed any opinions about the substance of the case to [his] fellow jurors."

The District Court excused Juror 25 from the trial and instructed him not to say anything about the matter to his fellow jurors.  At that point, Wright's counsel asked that the District Court question the remaining jurors about what Juror 25 had told them.  The District Court declined to do so.  The District Court instead asked all the jurors at the outset of that day's proceedings whether they had "heard, read, or seen anything at all concerning the substance of [the] case," whether they had "[d]iscussed the substance of the case with anyone," and whether "anyone [had] discussed the substance of the case in [their] presence," since they had recessed the previous Thursday.  When

- 21 -

each juror answered, "No," the trial then proceeded without objection.

## B.

Wright emphasizes that "any unauthorized communication between any person who is associated with the case . . . and a juror would have the potential for being prejudicial," unless the communication is completely unrelated to the case or is "shown to be harmless." United States v. O'Brien, 972 F.2d 12, 14 (1st Cir. 1992). But, nothing in the record suggests -- nor does Wright contend -- that the communication between Juror 25 and the FBI agent was "about the case." See id. ("In those instances where it is shown that there was a communication about the case, the communication would be deemed prejudicial unless shown to be harmless." (emphasis added)); United States v. Sampson, 486 F.3d 13, 41 (1st Cir. 2007) ("We have attached significance before to the fact that a juror's casual ex parte communication did not concern the substance of the case, and we think it is appropriate to continue to follow that praxis." (citing United States v. Angiulo, 897 F.2d 1169, 1185 (1st Cir. 1990)).

In any event, the District Court dismissed the only juror who had "an unauthorized communication [with] someone associated with the case." Id. Nor was any wrongdoing or bias on the part of any juror besides Juror 25, whom the District Court excused, alleged. Moreover, Wright does not suggest that, even if Juror 25

gave the other jurors a detailed account of his encounter with the FBI agent, the other jurors actually became biased against him.

Thus, the cases on which Wright relies in contending that it was an abuse of discretion for the District Court not to have questioned the other jurors about the incident at the restaurant are inapt. See United States v. Resko, 3 F.3d 684, 688-693 (3d Cir. 1993) (allegation that jurors had deliberated prematurely); United States v. Gaston-Brito, 64 F.3d 11, 13 (1st Cir. 1995) (allegation of an ex parte communication between a government agent and jurors); Government of the Virgin Islands v. Weatherwax, 20 F.3d 572, 578 (3d Cir. 1994) (allegation that jurors may have read an inaccurate newspaper article about the case); United States v. Lara-Ramirez, 519 F.3d 76, 87 (1st Cir. 2008) (allegation that Bible in jury room tainted proceedings); United States v. Paniagua-Ramos, 251 F.3d 242, 250 (1st Cir. 2001) (allegation from defendant's sister that two jurors had been seen conversing with the prosecutor during trial); United States v. Zimny, 846 F.3d 458, 464, 467-68 (1st Cir. 2017) (allegation that jury was exposed to extraneous prejudicial blog post and comments and had engaged in premature deliberations).

Wright's reliance on cases in which district courts took more steps to investigate concerns about juror taint than the District Court took here, see, e.g., United States v. Ortiz-Arrigoitia, 996 F.2d 436, 443 (1st Cir. 1993), also cannot help

his argument.  Those cases simply support the notion that "[t]he trial court has wide discretion in how it goes about this inquiry." Tejeda, 481 F.3d at 52.

### III.

We come, then, to the first of Wright's challenges to the District Court's jury instructions.  Wright first challenges the instruction that the District Court gave about the permissive inferences that the jury could make in determining whether Wright had the intent necessary for him to be found guilty on any count that required a finding of intent.  This challenge, like each of the challenges that we have thus far considered, appears to take aim at each of his convictions.

In reviewing preserved challenges to jury instructions, we "consider de novo whether an instruction embodied an error of law, but we review for abuse of discretion whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues."  United States v. Ackell, 907 F.3d 67, 78 (1st Cir. 2018) (quoting United States v. Gray, 780 F.3d 458, 464 (1st Cir. 2015)).  We assume favorably to Wright that his challenge alleges an error of law in the instruction.  But, even assuming our review is de novo, Wright's challenge fails.

The relevant instruction was as follows:

> I will tell you that the law provides that you may infer that a person intends the natural and probable consequences of what they say and do. Now when I say you may infer it, what that means is you could draw that conclusion, but you need not, that's left to you as the jury. You look at all the evidence to see whether the government [proved], because they've got to prove this -- this is essential [--] Mr. Wright's intent beyond a reasonable doubt.

(Emphasis added).

We have upheld instructions that allow for permissive inferences regarding intent. See, e.g., Lannon v. Hogan, 719 F.2d 518, 521-22 (1st Cir. 1983) (holding that the instruction, "you may infer or conclude that a person ordinarily intends the natural and probable consequences of acts knowingly done," did not contain constitutional error) (collecting First Circuit cases deciding the same). In fact, the First Circuit pattern jury instructions expressly include the language, "You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or omitted." Pattern Jury Instructions for the District Courts of the First Circuit § 4.18.1343 (2019).

But, as Wright points out, the District Court's instruction here does not track that pattern jury instruction word for word. The instruction instead states that the jury was permitted to "infer that a person intends the natural and probable consequences of what they say and do." (Emphasis added).

Wright asserts that, in deviating from the pattern instruction in this way, the District Court's instruction "improperly highlighted just one aspect of the case, the Defendant's words, to the exclusion of all the other evidence on this crucial point [of Wright's intent]." And, Wright contends, the instruction -- by highlighting his "words" -- undermined his entire defense at trial, which was "that, even though [Wright] said and wrote much of what the Government claimed he said and wrote, he did not intend to support ISIS, obstruct justice, or commit an act of violence."

Wright's reading of the instruction, however, is not a fair one. The instruction allows the jury to infer intent from both Wright's words <u>and</u> his conduct ("what they say <u>and do</u>"), and the instruction expressly states that the jury must "look at <u>all</u> the evidence." (Emphases added). For these reasons, the instruction is not like the one found to have been erroneous in <u>United States</u> v. <u>Rubio-Villareal</u>, 967 F.2d 294 (9th Cir. 1992), the out-of-circuit precedent on which Wright relies.

<u>Rubio-Villareal</u> addressed an instruction "which told the jury it could infer knowledge from two isolated facts -- that the defendant was the driver and that cocaine was concealed in the body of the vehicle." <u>Id.</u> at 298. By contrast, the District Court's instruction did not permit the jury to infer intent from such isolated facts. Thus, the instruction neither "effectively

told the jury in this case that the judge thought there was sufficient evidence to convict the defendant" nor "focused the jury on some rather than all the facts," as the instruction in Rubio-Villareal did.  Id. at 299.  In fact, the instruction stated that the jury must consider "all the evidence."  (Emphasis added). We therefore reject Wright's challenge to this jury instruction.

## IV.

Having dispensed with Wright's challenges that target his convictions generally, we now focus on Wright's challenges that concern only his convictions on specific counts -- namely, Counts One and Four.  We begin with Wright's challenges to his conviction on Count One.  The challenges concern, respectively, the sufficiency of the evidence to support the conviction on Count One and the District Court's instruction on the elements of the offense underlying that conviction.  We then will turn, in Part V, to Wright's challenges to his conviction on Count Four.  Those challenges concern, respectively, the sufficiency of the evidence to support his conviction on that Count and the District Court's jury instruction on the elements of the offense underlying that conviction.

## A.

To understand Wright's challenge to the sufficiency of the evidence for his conviction on Count One, it is necessary, first, to provide some background about the elements of the offense

of conviction and the understanding of the parties and the District Court as to what those elements required the government to prove. We then need to explain in further detail the aspects of the government's case for convicting Wright of that offense that he contends were not supported by sufficient evidence. Finally, we will explain why, given the arguments that Wright presses, his sufficiency challenge to his conviction on Count One fails.

**1.**

Wright was convicted on Count One of violating 18 U.S.C. § 2339B. "[T]o prove a violation [of § 2339B], the government must establish that a defendant (1) knowingly provided or attempted or conspired to provide material support (2) to a foreign terrorist organization (3) that the defendant knew had been designated a foreign terrorist organization or had engaged in terrorism." United States v. Dhirane, 896 F.3d 295, 303 (4th Cir. 2018), cert. denied sub nom., Jama v. United States, 139 S. Ct. 1207 (2019) (citing Holder v. Humanitarian Law Project, 561 U.S. 1, 16–17 (2010)). 18 U.S.C. § 2339B goes on to define "material support or resources" as "any property, tangible or intangible, or service, including," among other things, "personnel (1 or more individuals who may be or include oneself)." Id. § 2339B(g)(4) (defining

"material support or resources" in accordance with the definition used in 18 U.S.C. § 2339A(b)(1)).

The indictment alleged that, in violation of § 2339B, Wright conspired to provide "material support or resources" in the form of "services and personnel" to ISIS. At trial, however, the government argued only that, in connection with the co-conspirators' plot to kill Geller and police officers in the United States, Wright engaged in a conspiracy to provide "personnel" -- himself and potential recruits -- and not "services" to ISIS.

The government limited its case at trial to the "personnel" theory of liability. The government did so on the understanding that the jury should be in agreement, in the event that the jury returned a guilty verdict, as to the particular type of "material support or resources" -- i.e., "personnel" or "services" -- that Wright had conspired to provide.

With regard to "personnel," § 2339B provides that:

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be

- 29 -

> working under the foreign terrorist organization's direction and control.

Id. § 2339B(h).

Wright's counsel argued to the District Court, that, under the definition of "material support or resources" provided in § 2339A(b)(1), "personnel . . . is an example of a type of service." Neither § 2339A nor § 2339B provides a definition of "service." But, the Supreme Court, in the course of construing § 2339B, has noted that "a person of ordinary intelligence would understand the term 'service' to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization." Holder, 561 U.S. at 24 (emphasis added). Thus, drawing on Holder and the contention that "personnel is an example of a type of service," Wright's counsel requested that, despite the government's representation that it would press at trial only the "personnel" and not the "services" theory of Wright's criminal liability set forth in the indictment, the District Court "still instruct the jury that material support implies coordination."

The District Court agreed with Wright's counsel on this point. The government did not object. In consequence, the issue of whether the plot to kill Geller and the police officers that Wright was charged with conspiring to carry out was undertaken "in coordination with" ISIS, along with the issue of whether that plot was undertaken "at the direction of ISIS," became key issues at trial.

**2.**

The "at the direction of" and "in coordination with" theories "provide alternative, independently sufficient grounds for" sustaining the conviction with respect to the "material support or resources" element of the conspiracy offense at issue. United States v. Gaw, 817 F.3d 1, 5 (1st Cir. 2016) (quoting United States v. Cruz-Arroyo, 461 F.3d 69, 73 (1st Cir. 2006)). We have no need to address, however, whether there was sufficient evidence to convict Wright on the theory that he conspired to be part of a plot that was carried out "at the direction of" ISIS. That is because we reject Wright's contention that there was insufficient evidence for a rational jury to find beyond a reasonable doubt that Wright conspired to carry out a plot to kill Geller and others "in coordination with" ISIS. See id. ("[A]dequate proof of one [of two alternative theories of criminal liability] obviates any need for proof of the other." (quoting Cruz-Arroyo, 461 F.3d at 73)).

Our review of Wright's sufficiency challenge is de novo. See United States v. Ocean, 904 F.3d 25, 28 (1st Cir. 2018) (citing United States v. Ramírez-Rivera, 800 F.3d 1, 16 (1st Cir. 2015)). In undertaking that review, "[w]e view all the evidence, credibility determinations, and reasonable inferences therefrom in the light most favorable to the verdict in order to determine whether the jury rationally could have found that the government

established each element of the charged offense beyond a reasonable doubt." United States v. Valdés-Ayala, 900 F.3d 20, 30 (1st Cir. 2018) (internal quotation marks and punctuation marks omitted). In overcoming this "formidable standard of review," United States v. Loder, 23 F.3d 586, 589 (1st Cir. 1994), "[d]efendants challenging convictions for insufficiency of evidence face an uphill battle on appeal," United States v. Hernandez, 218 F.3d 58, 64 (1st Cir. 2000).

**3.**

To make the case that the evidence sufficed to support the conspiracy conviction at issue on the basis of an "in coordination with" theory of criminal liability, the government argues as follows. First, it contends that the evidence supportably showed that Wright's uncle and alleged co-conspirator, Rahim, communicated with a "Mr. Hussain" about the plot to kill Geller and others. The government further argues that the evidence supportably showed that this "Mr. Hussain" was at the time living in an ISIS-controlled territory in Syria and was a "high-profile" member of ISIS. The combination of this evidence, the government asserts, was legally sufficient to establish that Rahim and "Mr. Hussain" were conspiring to kill Geller and others "in coordination with" ISIS. The government thus contends that, so long as the evidence sufficed to show that Wright was part of that conspiracy to carry out that plot, the evidence sufficed, as a whole, to

- 32 -

support Wright's conviction for conspiring to provide "material support or resources" to ISIS on a "coordination" theory.

Wright asserts on appeal that, "[a]t best, the Government has shown that the plan was inspired by" (emphasis added) publicly available ISIS videos and documents, "but independent of, ISIS." In making this blanket assertion as to what the record shows about "the plan" and its connection to ISIS, though, Wright fails to engage with any of the evidence that we have just discussed that concerned "Mr. Hussain's" involvement in the plot at issue and "Mr. Hussain's" ties to ISIS. Instead, Wright merely makes a conclusory contrary characterization of the evidence as a whole with respect to ISIS's connection to the plot.

Such a conclusory assertion is not the kind of developed argument about the insufficiency of the evidence that Wright must make to succeed on his sufficiency challenge. It fails to address the evidence that the government points to in its brief to show that the evidence sufficed to prove that the plot at issue -- independent of whether Wright was a part of it -- was undertaken "in coordination with" ISIS.

By contrast, the evidence that the government introduced included, among other things, records of electronic communications between Rahim and Hussain, expert testimony that explained who Hussain was and what his ties to the ISIS organization were, and tweets that, the government contends, a jury rationally could find

- 33 -

were authored by Hussain and showed his substantial involvement in developing and facilitating the plot at issue. Because Wright addresses none of this evidence, we deem waived for lack of development any challenge to the sufficiency of the evidence to support this critical aspect of the government's case for satisfying the "coordination" requirement, concerning, as it does, the nature of the plot in which Wright is charged with having been a participant. See United States v. Benevides, 985 F.2d 629, 633 n.6 (1st Cir. 1993) ("[W]e decline to engage in speculation or to forge beyond the line of argument that defendant has explicitly pursued in his appeal.").

We recognize that Wright does also appear to advance the argument that there was insufficient evidence that he "coordinate[d] his efforts with members of the [ISIS]." In so arguing, Wright focuses on the fact that the government "failed to present any evidence of communication between the Defendant and any ISIS member regarding the plan." Wright stresses in this regard that the evidence showed at most that he simply downloaded publicly available videos and documents produced by ISIS. He then argues that evidence of that conduct cannot suffice to prove that he conspired to carry out the plot at issue "in coordination with" or, for that matter, "at the direction of" ISIS.

But, these contentions about what the evidence showed regarding Wright's own conduct relate merely to what the evidence

- 34 -

showed about the role that he played in the plot in which he is charged with having been a participant. Those contentions thus fail to provide a basis for rejecting the government's argument on appeal that the evidence supportably showed that Rahim and "Mr. Hussain" were engaged in a plot to kill Geller and others "in coordination with" ISIS.

To be sure, there does remain the question of whether the evidence was insufficient to show that Wright had the requisite intent and knowledge that the conspiracy that he was alleged to have joined was of such a kind. See United States v. García-Pastrana, 584 F.3d 351, 377 (1st Cir. 2009) (noting that the requisite mental state for conspiracy is "knowledge of the basic agreement" and "an intent to commit the underlying substantive offense" (quoting United States v. Brandon, 17 F.3d 409, 428 (1st Cir. 1994)). And, because Wright separately contends that the evidence did not suffice in that regard, we must address that question as well. As we next explain, though, we are not persuaded by Wright's argument that the evidence was lacking on that separate score.

As the government points out, Wright was charged as a co-conspirator in the plot to kill Geller and the police officers "in coordination with" ISIS and thus as a co-conspirator in a plot to "provide" what the parties agreed § 2339B treats as "material support or resources" to that terrorist organization. Wright is

- 35 -

therefore wrong to suggest that, merely because the government failed to put forth any evidence of communication between him and a member of ISIS, he could not be convicted of the conspiracy offense with which he was charged.  The Supreme Court has squarely rejected the argument that the government is required to prove that a defendant charged with conspiring to provide material support in violation of 2339B had the specific intent to further the terrorist organization's activities.  See Holder, 561 U.S. at 16-17 ("Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities." (emphasis added)).  Nor does the fact that Wright was charged with conspiring to commit that offense require the government to have made that showing.  See United States v. Piper, 35 F.3d 611, 615 (1st Cir. 1994) (noting that a defendant who "intentionally agrees to undertake activities that facilitate commission of a substantive offense, but who does not intend to commit the offense himself" may be convicted of conspiracy).

Wright also appears to contend that his sufficiency challenge has merit because the evidence was insufficient to show that he knew the nature of "Mr. Hussain's" involvement in the plot. But, even assuming, favorably to Wright, that the government was required under conspiracy law to make such a showing, compare

García-Pastrana, 584 F.3d at 377 (1st Cir. 2009) (noting that the requisite mental state for conspiracy is "knowledge of the basic agreement") with Ocean, 904 F.3d at 31 (concluding that a defendant need not know all the details of a conspiracy to be found guilty as a conspirator), we conclude that the evidence sufficed.

The government's evidence on this score included the recording and transcript of a May 26, 2015 call between Rahim and Wright, which supportably showed that Rahim recounted to Wright that he had received an encrypted document from "Mr. Hussain" with research on Geller, as well as Wright's response that "I gotta see that [document]." The government also presented testimony from Wright's co-conspirator Rovinski, who recounted that Wright, Rahim, and Rovinski had pledged their support to ISIS's leader, al-Baghdadi, and that their plot to kill Geller and others was intended to fulfill ISIS's stated goals. In the face of that evidence, we see no basis to conclude that there was insufficient evidence from which a rational jury could find that Wright knew not only about "Mr. Hussain's" involvement in the plot but also about his ties to ISIS. Thus, this aspect of Wright's sufficiency challenge lacks merit, too.

**B.**

Having rejected Wright's sufficiency challenge on Count One, we now consider his preserved challenge to the District

Court's jury instruction on that count.[3]  The jury instruction that

Wright challenges was as follows:

> The support must be "material," which means
> it's got to make some sort of difference, not
> a major coup necessarily, but it's got to make
> some difference to the goals, plans, strategy,
> tactics of this foreign terrorist
> organization, in this case it's ISIS.  And
> there's got to be -- what they do -- and again
> this is all part of this terrorist connection,
> what they plan to do has -- the specific
> language I want to use is that it has to be
> "conduct done in coordination with or at the
> direction of the foreign terrorist
> organization."
>
> Now the coordination -- and the reason that
> the government has to prove that is to
> prevent, um, the law from applying [to] some
> random act, just a random act of violence and
> then ISIS latches onto that and says, "Oh,
> yeah, those were our soldiers," or something
> like that.  They have to -- the conspiracy has
> got to be, um, cognizant of and acting in
> coordination -- it doesn't have to be direct
> orders, but in coordination with the strategy,
> the tactics of the foreign terrorist
> organization, in this case ISIS.  Well, that's
> the first question.

(Emphasis added).

Wright contends that this instruction, by virtue of the

underlined language, permitted the jury to find that he conspired

---

[3] The government does not dispute that Wright preserved this objection below.  The government does, however, argue that Wright's challenge to this instruction should be deemed waived for lack of development on appeal.  We do not agree with the government's characterization of Wright's briefing on appeal, in which he sufficiently ties his legal argument to the errors preserved below.  We thus proceed to address his instructional challenge on the merits.

to provide "material support or resources" to ISIS merely by having coordinated with ISIS's publicly available strategy and tactics, while acting independently of the terrorist organization itself. As Wright puts it, the District Court's expansive definition of "coordination" in the underlined language quoted above permitted the jury to convict him based on a finding that he acted with "mere awareness of the desires of the terrorist organization, delivered indirectly," without also finding that there had been any "communication between the Defendant and any ISIS member regarding the plan" or other any other "actual connection to the terrorist group." Wright further contends that this flaw in the instruction constituted reversible error.

Wright's challenge to this instruction is not merely that its wording is confusing. It is a contention that the instruction misstated the relevant law, so our review is de novo. See Ackell, 907 F.3d at 78.

In undertaking that review, we first explain why the instruction was in error. We then turn to a consideration of whether the error was harmless, first by determining the standard for assessing whether an error of this type is, in fact, harmless, and then by explaining why the applicable harmless error standard has not been satisfied by the government here.

## 1.

The government does not make any contention that, even if the instruction says what Wright says it does, it is a correct statement of the law. Instead, the government argues only that Wright misreads it.

The government focuses on the fact that the instruction begins with a statement that "[the conduct] has to be . . . done in coordination with or at the direction of the foreign terrorist organization." The government argues that this initial statement should be read to qualify the District Court's subsequent explanation of "coordination" as "coordination with the strategy, the tactics of the foreign terrorist organization." Thus, according to the government, the jury would have understood, taking the instructions as a whole, that it had to find that the "coordination" was with ISIS itself and not merely with its publicly available strategy and tactics.

But, we do not agree with the government's proposed reading of the instruction. The statement that "coordination" could be merely "coordination with the strategy, the tactics of the foreign terrorist organization" is preceded by a sentence that began, "Now the coordination." That same preceding sentence then goes on to "explain the reason that the government has to prove that."

In context, then, the instruction's key statement that describes "coordination" to be merely with the "strategy" and "tactics" of ISIS, rather than with the terrorist organization itself, is most naturally read as defining the same "coordination" that the District Court mentions in its initial statement that "[the conduct] has to be . . . done in coordination with or at the direction of the foreign terrorist organization."  Most naturally read, this more detailed definition of the kind of coordination that is required displaces the stricter requirement of "coordination with . . . the foreign terrorist organization" itself that the instruction earlier sets forth.  See United States v. Pizarro, 772 F.3d 284, 300 (1st Cir. 2014) (opting for the "most natural reading of [a] passage" in a jury instruction, "particularly in light of" other statements made by the District Court); United States v. Latorre-Cacho, 874 F.3d 299, 305 (1st Cir. 2017) (concluding "that the instructions as a whole did not suffice to disabuse the jury of the misimpression about what it needed to find that had been created by the erroneous part of the instructions").

The government does contend that such a reading of the instruction fails to account for the portion of it that elaborates on what constitutes "coordination" and that states that "it doesn't have to be direct orders."  The government argues that the statement at issue thus "could logically have been heard as merely

- 41 -

providing examples of conduct falling short of 'direct orders' (i.e., coordination with the organization regarding strategy or tactics)" that would suffice to show "coordination." The government thus contends that this portion of the instruction should be read to merely clarify that "coordination" need not rise to the level of "direct orders."

But, the statement in the instruction that "it doesn't have to be direct orders," even if properly read to clarify that "coordination" need not take the form of "direct orders," was still problematic. The statement cannot be read to say that "coordination" must be with the terrorist organization itself rather than with the organization's strategy and tactics, if merely publicly available. Thus, we conclude that, given the way that the words of the instruction juxtapose certain conduct that could suffice as "coordination" with certain conduct that could not, the instruction is most naturally read to state that "it" -- on the government's reading, "coordination" -- could be "with the strategy, the tactics of the foreign terrorist organization" and so need not be with the organization itself. See, e.g., Febres v. Challenger Caribbean Corp., 214 F.3d 57, 64 n.8 (1st Cir. 2000) (opting for a "phrase's more natural reading" in a jury instruction).

The conclusion that the instruction should be read as Wright urges us to read it finds additional support in another

portion of the instruction.  That portion supports Wright's proposed reading by setting forth one "example" of the type of conduct that might fall outside the statute's ambit: "a random act of violence [that] then ISIS latches onto."  (Emphasis added).  By ruling out only that one example, the instruction implicitly suggests what the displacing definition of "coordination" suggests: that a jury may deem a defendant to have acted "in coordination with" a terrorist organization based merely on a finding that the defendant had operated in parallel to that organization.

The government does not cite -- nor do we know of -- any authority to support such an expansive construction of the "material support or resources" element of the offense.  Nor does the government develop any argument that, insofar as it is so read, the instruction still properly stated the law of what constitutes "coordination."  We thus conclude that, at least given the arguments presented to us, Wright has adequately made the case that the instruction on Count One with respect to the definition of "coordination" constitutes legal error.

**2.**

Of course, "[e]ven an incorrect instruction to which an objection has been preserved will not require us to set aside a verdict if the error is harmless."  United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012) (citing United States v. Argentine,

814 F.2d 783, 788-89 (1st Cir. 1987)). The determination of whether the erroneous instruction was harmless turns in part on whether the flaw in it was of a constitutional dimension. We thus start by considering that issue.

**a.**

An instruction that relieves the government of its burden of proving beyond a reasonable doubt an element of the offense violates the Due Process Clause of the Fifth Amendment to the Constitution. See Patterson v. New York, 432 U.S. 197, 210 (1977). Such an instruction is harmless if "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). The government bears the burden, moreover, of showing that an instruction that is constitutionally flawed is harmless. See United States v. Sepulveda-Contreras, 466 F.3d 166, 171 (1st Cir. 2006).

The government does not explain how -- if we conclude that the instruction says what Wright contends that it says -- we could reach any conclusion other than that it reduced the government's burden to prove one of the theories that the parties themselves agreed was necessary to prove the "material support or resources" element of the conspiracy charge at issue. After all, the government makes no argument that an instruction that permitted

- 44 -

Wright to be convicted merely for having coordinated with the "strategy" and "tactics" of ISIS properly described the "coordination" that it agreed had to be proven, in the event that "direction" was not. Accordingly, we proceed on the understanding that this instructional error is a constitutional one and thus triggers the harmless error standard for errors of that magnitude.

The government submitted both the "coordination" and "direction" theories of the "material support or resources" element to the jury. As the government rightly notes, nothing in the government's presentation of the case "force[d] or urge[d]" the jury "to decide the case on the theory [implicated by the flawed instruction]." See United States v. Skilling, 638 F.3d 480, 483 (5th Cir. 2011). Thus, when applying the demanding harmless error standard for constitutional errors, we are required to affirm the conviction if the evidence for either theory of guilt -- "coordination" or "direction" -- was so "overwhelming . . . that the jury verdict would have been the same absent the error." Neder, 527 U.S. at 17; see United States v. Zhen Zhou Wu, 711 F.3d 1, 30 (1st Cir. 2013) (citing Neder, 527 U.S. at 17; Hedgpeth v. Pulido, 555 U.S. 57 (2008)).

The government makes no argument, however, that it met the harmless error standard for a constitutional error with respect to the "in coordination with" theory of guilt, which is the theory that the flawed instruction described. See United States v.

- 45 -

Rodríguez-Marrero, 390 F.3d 1, 18 (1st Cir. 2004) (noting that we may deem any harmless error argument not briefed by the government as waived).  The only respect in which the government even touches on the harmlessness of the instruction is its contention that "[a]ny possibility that Wright would have been prejudiced by any confusion caused by this instruction, moreover, is lessened by the government's closing argument . . . that the evidence showed that he acted at 'the direction of' ISIS, and not merely in coordination with ISIS."  We thus confine our harmless error analysis to determining whether the government has met its burden to show that the evidence that Wright participated in the plot "at the direction of" ISIS was "overwhelming,"  see Neder, 527 U.S. at 17, as it must be to render harmless the constitutional error caused by the instruction.

**b.**

The government argued to the jury at trial -- and argues to us on appeal -- that the evidence of "Wright's avowed intent to attack Geller to fulfill the fatwa established that he was acting 'at the direction' of ISIS."  To make that case, the government relied heavily on Rovinski's testimony to show that Wright had pledged allegiance to ISIS's leader and that Rovinski, Rahim, and Wright were making a plan to kill Geller and others to fulfill ISIS's fatwa in the hopes of attaining "martydom."  But, such evidence is solely based on a government cooperator's testimony,

which is a type of evidence that is rarely deemed to be overwhelming on its own. See United States v. Melvin, 730 F.3d 29, 39 (1st Cir. 2013) (rejecting the government's argument that the "evidence of the defendant's guilt was so overwhelming as to render the [error] benign" where "[t]his proposition relie[d] heavily on [a cooperating witness's] testimony"); see also, e.g., United States v. Ramirez-Rivera, 800 F.3d 1, 33 (1st Cir. 2015) (finding a constitutional error not harmless where "the only other evidence connecting [the defendant] to anything illegal was the testimony of the cooperators, which they provided in exchange for leniency in their own cases"); United States v. Ocasio-Ruiz, 779 F.3d 43, 48 (1st Cir. 2015) (finding an error not harmless where "the government's cooperating witness . . . gave the only evidence tying [the defendant] to the [crimes]").

Moreover, Wright testified extensively at his trial that he was simply engaged in an "ISIS role-play fantasy" to "escape [his] real life at the time," in which he was "morbidly obese" and "playing video games all day." Wright did admit in his testimony that he "said a lot of things that sound[ed] like [he] w[as] really in support of ISIS," but Wright also testified that these statements were nothing more than "trash-talking" and "trolling." Wright testified, for example, that he never intended to support ISIS or to carry out ISIS's "plan" to kill Geller and police officers.

Consistent with this aspect of Wright's testimony, we note, Wright also offered expert testimony from a neuropsychologist. She testified that Wright had "significant elements of a personality disorder." She also testified that Wright had a fragile ego, used language to impress other people, and had an unrealistic perception of who he was and impaired personal relationships.

To be sure, "the jury [may have chosen] to credit the accounts of the cooperating witness[] over the admittedly self-serving testimony of the defendant." United States v. Ofray-Campos, 534 F.3d 1, 28-29 (1st Cir. 2008). But, "[Wright's] countervailing testimony on his own behalf is a factor in conducting the harmless error analysis." Id. Taking account of that factor here, we conclude that a rational jury could have found from this evidence that Wright could have been simply "role-playing" with respect to following ISIS's direction. We thus cannot find the constitutional error in the instruction to have been harmless beyond a reasonable doubt, because the evidence to which the government points to make that showing fails to show that there was "overwhelming" evidence that Wright had conspired to kill Geller and others "at the direction of" ISIS. And that is so, even if we were to assume that -- as the government contends

-- intending to fulfill a publicly made ISIS decree constitutes acting "at the direction of" ISIS.[4]  See Neder, 527 U.S. at 17.

**V.**

Wright next challenges his conviction on Count Four for conspiracy to commit an act of terrorism transcending national boundaries.  See 18 U.S.C. § 2332b(a)(2) and (c).  Wright challenges this conviction -- just as he challenged his conviction on Count One -- both on sufficiency grounds and in consequence of an allegedly erroneous jury instruction.  We begin with his sufficiency challenges.

**A.**

Entitled, "Acts of terrorism transcending national boundaries," § 2332b(a)(2) provides that whoever "conspires" "to commit an offense under [18 U.S.C. § 2332b(a)(1)] . . . shall be punished under [18 U.S.C. § 2332b(c)]."  18 U.S.C. § 2332b(a)(2). Section 2332b(a)(1), in turn, provides in relevant part that "[w]hoever, involving conduct transcending national boundaries . . . , kills, kidnaps, maims, commits an assault

---

[4] Wright also challenges his conviction on Count One based on the District Court's refusal to give a clarification that it is "legal to join, associate, advocate, and even praise a terrorist organization."  Because we vacate and remand Wright's conviction on Count One on the ground that the instruction that the District Court did give on "material support or resources" was erroneous, we have no occasion to consider whether Wright's proposed instruction -- insofar as it would attach to the District Court's erroneous instruction -- was required.

resulting in serious bodily injury, or assaults with a dangerous weapon any person within the United States . . ." shall be subject to specified punishments. Id. § 2332b(a)(1)(A). The statute defines "conduct transcending national boundaries" to mean "conduct occurring outside of the United States in addition to the conduct occurring in the United States." Id. § 2332b(g)(1).

Wright premises his sufficiency challenges on the argument that, under § 2332b(a)(1), the "[a]ct of terrorism" must be one "involving conduct transcending national boundaries." See § 2332b(g)(1). He contends, first, that the "conduct transcending national boundaries" must be "substantial" and that the only evidence of "conduct transcending national boundaries" that the government sufficiently proved at trial is not "substantial." For that reason, Wright contends that the evidence put forward to satisfy the "transcending national boundaries" requirement is not sufficient. Wright then separately contends that, because he was convicted as a conspirator under 18 U.S.C. § 2332b, the requirements of conspiracy law obliged the government "to prove that [Wright] knew and intended that the plan to kill would involve conduct transcending national boundaries." Yet, he contends, the evidence at trial was not sufficient to permit a rational juror to so find.

We review Wright's preserved Count Four sufficiency challenges de novo. See Ocean, 904 F.3d at 28. As we did when

reviewing Wright's Count One sufficiency challenges, "we view all the evidence, credibility determinations, and reasonable inferences therefrom in the light most favorable to the verdict in order to determine whether the jury rationally could have found that the government established each element of the charged offense beyond a reasonable doubt." Valdés-Ayala, 900 F.3d at 30 (internal quotation marks and punctuation marks omitted).

## 1.

We start with Wright's contention concerning the failure of the government to prove that the "conduct transcending national boundaries" was "substantial." We are not persuaded.

Even if we were to agree that the "conduct" must be "substantial" to constitute "conduct" within the meaning of the statute's "conduct transcending national boundaries" requirement, the evidence that the government put forth at trial sufficed. To see why, recall that, in countering Wright's sufficiency challenge to his conviction on Count One, the government argued that it introduced sufficient evidence that Rahim was plotting with a "Mr. Hussain" to kill Geller and others. That is significant for present purposes, because, in countering Wright's sufficiency challenge to his conviction on Count Four, the government contends that this same evidence sufficed to show that the conspiracy was to commit a killing "involving conduct transcending national boundaries," because there was evidence sufficient to show both

- 51 -

that "Mr. Hussain" was involved in the plot to kill Geller and others and that "Mr. Hussain" was overseas during that involvement.

The government's evidence on the latter score included a British foreign intelligence expert's testimony and social media records, which the government contends supportably showed that "Mr. Hussain" was in fact a British national, Junaid Hussain. The government then proceeds to point out that it introduced certified border-crossing records to supportably show that Junaid Hussain -- who, other evidence supportably showed, also went by the moniker, Abu Hussain -- had never traveled to the United States. The government thus contends that a rational jury could find from this body of evidence, taken as a whole, that Hussain's conduct in connection with the plot -- exchanging information about the plot to kill Geller with Rahim -- took place overseas and that the plot "involv[ed] conduct transcending national boundaries."

Notably, Wright does not appear to contend otherwise. In fact, Wright at one point appears to concede that "the jury may have been legally entitled to infer from these facts that 'abuhussain' was overseas." We thus proceed on the understanding that the evidence was sufficient to establish that "Mr. Hussain" was involved in the plot to kill Geller and others and that Mr. Hussain's involvement took place overseas. But, for that reason, Wright's sufficiency challenge has little merit.

The government points out that the District Court found that the evidence of Hussain's involvement in the plot was significant enough to deem him a co-conspirator, and Wright does not challenge that finding on appeal.  That evidence, we agree, sufficed to show that Hussain did not merely "communicate" with Rahim but provided him with research and guidance on the plot to kill Geller, and Wright does not argue otherwise.  Thus, we agree with the government that the evidence of Hussain's involvement in the plot at issue sufficed to show that the "conduct transcending national boundaries" was "substantial" under any reasonable interpretation of that term.

**2.**

We turn now to Wright's other sufficiency challenge to his conviction on Count Four.  Here, he contends that the evidence was lacking to permit a rational juror to find him guilty of conspiring to commit the underlying offense, given what he contends are the requirements of conspiracy law.

But, Wright misapprehends conspiracy law, insofar as he contends that the government had to prove not only that the evidence showed that he intended to join a plot that he knew was to commit a killing involving "conduct transcending national boundaries," but also that he intended that the killing would involve such extra-territorial conduct.  Conspiracy law simply imposes no such proof requirement on the government.  Piper, 35

F.3d 611 at 615 (noting that a defendant who "intentionally agrees to undertake activities that facilitate commission of a substantive offense, but who does not intend to commit the offense himself" may be convicted of conspiracy).

There does remain the question of whether the evidence sufficed to show that, in joining the conspiracy, Wright knew that the plot was to kill Geller and others in a manner "involving conduct transcending national boundaries." But, while Wright contends that there was not sufficient evidence on that score, we disagree.

As the government points out, it introduced sufficient evidence of "Wright's knowledge that Rahim was communicating with Hussain about their plans [to kill Geller] and awareness that Abu Hussain was overseas." The government's evidence on this score included copies of two "Islamic State e-books" that Wright had shared with Rahim that listed Hussain as a member of ISIS living in Syria. The evidence also included the recording and transcript of the May 26, 2015 call between Rahim and Wright in which Rahim told Wright that "Mr. Hussain" had information that one of Wright's friends was attending ISIS training in Syria, from which, the government contends, a rational jury could infer that Wright must have known that Hussain was overseas.

In response, Wright merely states, without further explanation, that "there is no evidence that he agreed or intended

that any plan to kill would be conducted, in significant part, by someone overseas." But, this cursory statement is inadequate to satisfy Wright's burden to explain why the evidence that the government identifies on appeal was legally insufficient to show the requisite knowledge. See Zannino, 895 F.2d at 17. We thus reject Wright's sufficiency challenge to his conviction on Count Four.[5] See Benevides, 985 F.2d at 633 n.6.

**B.**

We now consider Wright's preserved challenge to the District Court's jury instruction on Count Four. The relevant instruction was as follows:

> Well, the first two steps are exactly the same, the government has to prove that Mr. Wright was part of a conspiracy, as I have

[5] Wright also argues that the District Court erred in denying his motion for a new trial because, even assuming that the government established a legally sufficient circumstantial case on Count Four, the evidence that the plot "involv[ed] conduct transcending national boundaries" lacked probative force. "[T]he decision to grant or deny a new trial is committed to the sound discretion of the district court," United States v. Andrade, 94 F.3d 9, 14 (1st Cir. 1996) (quoting United States v. Soto-Alvarez, 958 F.2d 473, 479 (1st Cir.), cert. denied, 506 U.S. 877 (1992)), and the denial of a motion for a new trial is reviewed for manifest abuse of that discretion, Gaw, 817 F.3d at 10. The remedy of a new trial based on the weight of the evidence is to be "sparingly used, and then only where there would be a 'miscarriage of justice'" if the verdict were left in place. United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986) (quoting United States v. Indelicato, 611 F.2d 376, 387 (1st Cir. 1979)). Wright points to the fact that the evidence of overseas conduct was minimal and suspect, but his argument is cursory at best, and he makes no attempt to satisfy this "miscarriage of justice" standard or meet the demands of the deferential abuse-of-discretion standard. Therefore, this argument also fails.

defined that to you. Second, they have to prove -- and the specific intent here, the specific intent is different, but they've got to prove specific intent, they've got to prove it beyond a reasonable doubt. Here the specific intent has got to be to commit acts of terrorism transcending national boundaries . . . .

Second, because it requires, um, transcending national boundaries, in this one there has to be conduct that they're planning within the United States, the conspirators, and there also has to be conduct outside the United States, somewhere, anywhere outside the national boundaries of the United States. The conduct? Now the conduct can be communication of some sort, encouragement, direction, but it's got to be conduct outside the United States . . . .

Now one or more members of the conspiracy, and the government says the conspiracy is at least Wright, Rahim, and Rovinski, they've got to know about the foreign, um, communication, or direction, or encouragement, or the foreign conduct related to what they're doing, and it doesn't mean that Wright has to know specifically because you see if one is a conspirator, not every conspirator has to know everything every other conspirator is doing. Conspiracy is like a partnership and if one of the -- once they're a partnership, the things that the partners do in furtherance of the conspiracy is attributed to all the partners.

But at least they've got to show that that Wright was -- that Wright himself, the person who's on trial here, that he reasonably understood that he was engaged in a conspiracy to do conduct that transcends national boundaries, that has this terrorist connection as I've just defined it to you.

(Emphasis added).

**1.**

Wright first argues that the District Court erroneously instructed the jury that "conduct" can mean mere communication. He contends that the "conduct [transcending national boundaries] must be, in some way, criminal." Again, we "consider de novo whether an instruction embodied an error of law." Ackell, 907 F.3d at 78.

Wright develops no argument as to why the "conduct transcending national boundaries" to which the statute refers must in and of itself be criminal. Moreover, although the instruction does list "communication" as one example of "conduct," it immediately emphasizes that such communication "[has] got to be conduct outside the United States." This language tracks the statute's definition of "conduct transcending national boundaries." See id. § 2332b(g)(1) ("'[C]onduct transcending national boundaries' means conduct occurring outside of the United States in addition to the conduct occurring in the United States."). Therefore, we see no legal error in the District Court's instruction on "conduct transcending national boundaries."

**2.**

Wright also argues that the District Court erred by refusing to instruct the jury, as he requested, that it needed to find that he intended that the "act of terrorism" to be committed would involve "conduct transcending national boundaries." We

review the District Court's refusal to give an instruction requested by the defendant for abuse of discretion and will "only reverse if the proposed instruction is '(1) substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concern[ed] an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense.'" United States v. Belanger, 890 F.3d 13, 32 (1st Cir. 2018) (quoting United States v. González-Pérez, 778 F.3d 3, 15 (1st Cir. 2015)) (alteration in original). "The burden is on the defendant, as the proponent of the theory, to identify evidence adduced during the trial that suffices to satisfy this standard." United States v. Ramos-Paulino, 488 F.3d 459, 462 (1st Cir. 2007) (citing United States v. Rodriguez, 858 F.2d 809, 814 (1st Cir. 1988))).

The District Court began its instruction with a statement that the jury was required to find Wright's "specific intent . . . to commit acts of terrorism transcending national boundaries." Wright makes no argument that this statement in and of itself failed adequately to inform the jury of the intent that he contends that it was required to find that he had. Wright contends, instead, that the District Court's instruction as a whole

failed to do so, because of a subsequent portion of the instruction.

That portion of the instruction described conduct that Wright need not "know specifically" for a jury to find him guilty as a conspirator. That portion of the instruction also stated that the government "[has] got to show that . . . Wright himself . . . reasonably understood that he was engaged in a conspiracy to do conduct that transcends national boundaries." Wright contends that, in consequence of these statements, this portion of the instruction implied that proof of his mere knowledge that the plot was to commit an "act of terrorism" involving conduct "transcending national boundaries" -- rather than proof that he intended that the "act of terrorism" to be committed would involve conduct "transcending national boundaries" -- was sufficient to convict him of the conspiracy charge that he faced. Thus, Wright contends, the District Court's instruction failed to "substantially cover[]" his requested instruction with respect to his intent.

But, the District Court's statement concerning the level of knowledge of the conduct "transcending national boundaries" that Wright needed to have did not purport to displace its previous instruction that the jury needed to find that Wright had "the specific intent . . . to commit acts of terrorism transcending national boundaries." In fact, consistent with that conclusion,

- 59 -

we note that, elsewhere in the instructions, as the government points out, the District Court summarized conspiracy law by stating that "for every conspiracy, he's got to have a specific intent, and the government's got to charge what the specific intent is, and this is important. . . . He's got to have that specific intent."

We must consider the instructions as a whole. See United States v. Richardson, 225 F.3d 46, 54 (1st Cir. 2000). Wright acknowledges that proof of intent is a distinct requirement for this offense from proof of knowledge -- given that Wright was charged with a conspiracy offense. We thus do not see how the instructions regarding the knowledge requirement can fairly be read to displace or water down the District Court's separate instructions on intent, which Wright does not contend were, in and of themselves, erroneous.

Insofar as Wright means to argue that the wording of the instruction was "confusing" on this point, because the jury might not differentiate between the "intent" and "knowledge" requirements, he did not raise that specific argument below. Thus, our review would be only for plain error, but Wright develops no argument as to how he could meet that standard. See United States v. Prieto, 812 F.3d 6, 17 (1st Cir. 2016).

The District Court, as we have noted, did make a statement in which it instructed the jury that Wright did not need

"to know specifically" about "the foreign conduct." Wright appears to contend that, independent of his challenge to the instruction based on how it described the element of "intent," this statement by the District Court about what Wright needed to "know specifically" was erroneous. He appears to contend, in this regard, that this statement was likely to confuse the jury as to whether Wright himself needed to know that the terrorist act to be committed would involve conduct that "transcended national boundaries."

But, insofar as Wright does mean to advance that argument regarding the "knowledge" element, he cannot do so successfully. At trial, Wright only objected to the District Court's "specific intent" instruction, and did not raise any concerns about the District Court's instruction as it pertained to what he was required to know. Consequently, even if Wright does mean to raise this argument about the "knowledge" instruction on appeal, our review would be only for plain error. See Prieto, 812 F.3d at 17. But, once again, Wright develops no argument as to how he could meet that standard.

Nor do we see how he could. As the government points out, the instruction regarding what he needed to "know specifically" followed a discussion of particular types of conduct that would qualify as "conduct transcending national boundaries," and a conspirator need not be proven to have known all the details

of a conspiracy.  Ocean, 904 F.3d at 31.  Moreover, immediately after instructing the jury as to what Wright did not need to "know specifically," the District Court correctly stated that the government needed to show that Wright "reasonably understood that he was engaged in a conspiracy to do conduct that transcends national boundaries."  We thus cannot say that, when the instructions are "considered as a whole," the portion of the instruction that concerned what Wright had to "know specifically" constituted a "clear and obvious" error.  See id. (describing the plain error standard in the context of jury instructions).

## VI.

For the foregoing reasons, we affirm Wright's convictions on Counts Two through Five, and we vacate Wright's conviction on Count One and remand for further proceedings not inconsistent with this opinion.