# United States Court of Appeals
## For the First Circuit

No. 05-1681

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE GERARDO CRUZ-ARROYO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Selya, Lipez and Howard, Circuit Judges.

Rafael F. Castro Lang for appellant.
Jacqueline D. Novas, Assistant United States Attorney, with
whom H. S. García, United States Attorney, and Nelson Pérez-Sosa,
Assistant United States Attorney (Senior Appellate Attorney), were
on brief, for appellee.

August 24, 2006

**SELYA**, **Circuit Judge**. Following a lengthy trial, a petit jury convicted defendant-appellant Jose Gerardo Cruz-Arroyo on four counts involving Hobbs Act extortion and related money laundering. In this venue, the appellant challenges the sufficiency of the evidence and the constitutionality of convictions based mainly on evidence neither identified in the indictment nor previewed before the grand jury. We affirm.

## I. BACKGROUND

Because the appellant mounts a challenge to the sufficiency of the evidence, we rehearse the relevant facts in the light most hospitable to the verdict, consistent with record support. See United States v. Sánchez-Berríos, 424 F.3d 65, 71 (1st Cir. 2005).

In the 1990s, Puerto Rico began the substantive process of privatizing government-owned hospitals. See P.R. Laws Ann. tit. 24 §§ 3301-3325 (repealed 2003). The enabling legislation, among other things, authorized the Department of Health (the DOH) to contract out certain health-care services and to sell off public hospitals. That aspect of the legislation required the DOH, acting in concert with the Government Development Bank (the GDB), to approve each such transaction. See id. § 3303.

Sales of public hospitals typically had to be accomplished through competitive bidding. See id. If, however, a financially sound investor already was administering the affairs of

-2-

a particular public hospital, the DOH could short-circuit the bidding process and negotiate directly with that investor for a sale of the hospital.  See id. § 3306.  In an effort to take advantage of the direct-sale option, Caribbean Anesthesia Services, Inc. (CAS) sought to assume an existing contract for the administration of the Dr. Alejandro Otero López Hospital (the Hospital) in Manatí, Puerto Rico.  The contract was, at the time, held by Caribbean Hospital Corporation (CHC).

As part of a push to gain the DOH's approval for the contract assumption, a CAS consultant arranged a luncheon between CAS shareholders and the appellant, who was the chief legal adviser to the Secretary of Health (the Secretary) and the director of the DOH's law department.  At this luncheon — attended on CAS's behalf by, among others, José De Jesús-Toro, José Ivan Ramos Cubano, and Alvin Ramirez Ortiz — the appellant learned of CAS's interest in taking over the Hospital's management contract and, ultimately, in purchasing the facility outright.  When the meeting ended, the appellant said that he would help CAS in whatever way he could. The CAS shareholders thereafter agreed that De Jesús-Toro would shepherd the relationship with the DOH generally and with the appellant specifically.

From that point forward, the appellant served as CAS's ears and eyes in the government, keeping De Jesús-Toro abreast of all developments.  CAS soon learned of two potential snags.  First,

there were other groups interested in acquiring the Hospital. Second, the GDB's counsel had issued an opinion that highlighted a dispute over whether CAS would be responsible for monies owed to the DOH by its assignor (CHC). This dispute was significant both because of the size of the debt and because, under Puerto Rico law, an entity in debt to the DOH could not take advantage of the direct-sale option. See id. § 3306. Since the management contract had only a short time left to run, the GDB's counsel argued that the Hospital should be auctioned off through an open bidding process.

In October of 1997, the DOH overrode the GDB's objections, approved CAS's proposed acquisition of the management contract, and gave CAS until June 30, 1998 to negotiate terms for a direct sale of the Hospital. CAS took over management of the facility the next month.

On November 25, 1997, while the direct-sale negotiations were in full flower, De Jesús-Toro wired $15,000 from a CAS account to the appellant's bank account. On January 10, 1998 — more than a month later — the appellant instructed his bank to return the money because it did not belong to him. However, a mere four days thereafter, De Jesús-Toro withdrew $35,000 from a CAS account and used the funds to procure fourteen money orders, each in the amount of $2,500. Without exception, the proceeds of these money orders found their way into the appellant's possession before the direct-

sale deadline. The appellant used the funds for a variety of personal purposes (e.g., to make a down payment on a new automobile, to pay for his children's private schooling, and to augment individual retirement accounts held by him and his wife).

In June of 1998, CAS sent a letter of intent for the Hospital purchase to the GDB and the DOH. Although the privatization committee found CAS to be a suitable purchaser, an auditor's report indicated that the debt dispute had not been resolved. A meeting was arranged between the GDB, the DOH, the Governor's chief of staff, and CAS. José Quirós, who held a twenty percent equity interest in CAS, met with the appellant beforehand in order to present his views on the matter. When the four-way meeting occurred, the Governor's chief of staff requested that the appellant draft a legal opinion to resolve the uncertainty.

In an initial opinion, dated September 4, 1998, the appellant found that CAS was responsible for the debts amassed by its predecessor-in-interest (CHC). Shortly thereafter, the appellant did an about-face and prepared a revised opinion, dated September 14, 1998, in which he concluded that CAS was not responsible for the debts amassed by CHC. The revised opinion was accepted by the agencies involved and made CAS eligible to purchase the Hospital without the hindrance of competitive bidding. The parties closed on the direct sale three days later (although CAS

and the DOH continued to debate financial issues that arose out of CAS's earlier management of the Hospital).

At the same time that the DOH was dickering with CAS over the debt issue, the appellant was negotiating sub rosa to become in-house counsel for Pinnacle (a company controlled by Quirós). In those negotiations, the appellant presented Pinnacle with a wish list that included a $144,000 annual salary, a luxury car, a retirement plan, health benefits, sick leave, paid vacation, and summer camp for his children. In Quirós's words, he and De Jesús-Toro "felt obliged" to hire the appellant, notwithstanding the fact that his demands far exceeded what Pinnacle had budgeted for the position.

In August of 2000, while both the appellant's employment negotiations and CAS's debt negotiations were ongoing, De Jesús-Toro leased an Audi for the appellant's use. CAS not only footed the bill but also gave the appellant the use of a gasoline credit card, free of charge.

On October 6, 2000, Pinnacle, through Quirós, formally offered the appellant the in-house counsel position. CAS and the DOH resolved their remaining financial issues the next month. The appellant started work at Pinnacle in January of 2001. The jury supportably could have found that these events were not merely coincidental but, rather, inextricably intertwined; Pinnacle managed two medical centers, including CAS's newly acquired

Hospital, and these two institutions jointly paid the salaries of all Pinnacle's employees (including Pinnacle's neophyte in-house counsel).

In due course, a federal grand jury indicted the appellant and four codefendants (including De Jesús-Toro, Ramos Cubano, and Ramirez Ortiz). The indictment charged the appellant with two counts of extortion (viz., one count of conspiracy to interfere with commerce by extortion and one count of interference with commerce by extortion) and two counts of conspiracy to commit money laundering. See 18 U.S.C. §§ 1951, 1956. After a forty-one day trial, a petit jury found the appellant guilty across the board. This timely appeal ensued.

## II. ANALYSIS

Before us, the appellant advances three assignments of error. First, he argues that the evidence was insufficient to support the verdict on the Hobbs Act extortion charges (counts 1 and 2). Second, and relatedly, he maintains that this same dearth of evidence undermines his convictions for money laundering (counts 3 and 4) because the alleged extortion served as the underlying predicate offense on which those charges were based. Third, he posits that his convictions on all four counts must be set aside due to a fatal variance: those convictions were premised on evidence neither submitted to the grand jury nor referenced in the

indictment. We address the three components of this asseverational array sequentially.

## A. Counts 1 and 2.

We review challenges to the sufficiency of the evidence de novo, assessing the proof in the light most hospitable to the verdict. See United States v. Vega Molina, 407 F.3d 511, 526 (1st Cir. 2005); United States v. Valle, 72 F.3d 210, 216 (1st Cir. 1995). The test is whether the evidence, including all reasonable inferences therefrom, would permit a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of the crime charged. See United States v. Maldonado-García, 446 F.3d 227, 231 (1st Cir. 2006). We administer the test without any independent evaluation of the credibility of the witnesses. See United States v. Franky-Ortiz, 230 F.3d 405, 407 (1st Cir. 2000). Finally, we caution that to achieve a passing grade on this test, the prosecution need not have succeeded in negating every possible theory consistent with the defendant's innocence. See Maldonado-García, 446 F.3d at 231.

The Hobbs Act criminalizes conduct that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do." 18 U.S.C. § 1951(a). To support the Hobbs Act charges in this case then, the government needed to establish that the appellant committed extortion and that his

-8-

actions affected interstate or international commerce. See id. We consider the sufficiency of the evidence as to each such element.

1. **Extortion**. The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id. § 1951(b)(2). The indictment charged the appellant with extortion both under color of official right and through inducement by economic fear. The "color of official right" and "fear" prongs provide alternative, independently sufficient grounds for finding extortion; thus, adequate proof of one obviates any need for proof of the other. See United States v. Bucci, 839 F.2d 825, 827 (1st Cir. 1988) (explaining that "the prosecution can establish a violation by showing that a defendant induced payment either through the use of . . . fear, or under color of official right"); United States v. Hathaway, 534 F.2d 386, 393 (1st Cir. 1976) (similar).

The appellant contends that in a Hobbs Act "color of official right" case, the government must show that the official somehow "induced" the payment. This emphasis exaggerates the government's burden. To establish guilt for extortion under color of official right, the prosecution must show only that the defendant, a public official, has received an emolument that he was not entitled to receive, with knowledge that the emolument was tendered in exchange for some official act. See Evans v. United

States, 504 U.S. 255, 268 (1992); United States v. Cruzado-Laureano, 404 F.3d 470, 481 (1st Cir. 2005). The government is not required to prove any affirmative act of inducement on the part of the corrupt official. See Evans, 504 U.S. at 268.

Here, the evidence reveals that the appellant accepted $35,000 in serial money orders derived from a CAS account. He received and spent these funds while the DOH's approval of CAS's proposal to acquire the Hospital hung in the balance. Given the appellant's pivotal role in the DOH's triage of hospital purchase proposals, the importance attached to his opinion by the Governor's chief of staff, and his resultant power to impact CAS's financial interests, the jury reasonably could have inferred that the money orders were intended as reciprocity for official acts, past or future — and that the appellant knew as much.

In an effort to blunt the force of this reasoning, the appellant suggests that these payments were simply the fruits of his "special relationship" with De Jesús-Toro. That relationship, the appellant muses, inspired De Jesús-Toro to make a generous, no-strings-attached gift. We need not dwell on the inherent implausibility of such an explanation; it suffices to say that the government need not refute every alternative theory consistent with the defendant's innocence in order to defeat a sufficiency of the evidence challenge. See United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998). In this instance, the jury acted well within its

proper province in rejecting the somewhat fanciful claim that the appellant received a considerable sum of money due to friendship with a man who just happened to be a beneficiary of his official acts. Cf. United States v. Ortiz, 966 F.2d 707, 712 (1st Cir. 1992) (explaining that "jurors are neither required to divorce themselves from their common sense nor to abandon the dictates of mature experience").

We have said enough on this score. Since a plausible view of the evidence supports a finding that the appellant accepted the money orders in exchange for official acts, the proposition that the government failed to establish extortion under color of official right necessarily fails.

Although this finding, without more, establishes the extortion element, we note for the sake of completeness that the evidence also suffices to ground a finding of extortion induced through fear. We explain briefly.

Under the Hobbs Act, "fear" encompasses fear of economic loss, including the loss of business opportunities. See Bucci, 839 F.2d at 827. To establish that kind of fear, the government must show that the victim reasonably feared that noncompliance with the putative extortionist's terms would result in economic loss. See United States v. Rivera Rangel, 396 F.3d 476, 483 (1st Cir. 2005). The evidence in this case satisfies that criterion.

CAS made a substantial investment when it assumed the management contract for the Hospital — and it risked forfeiting both that investment and the prospect of future profits if the DOH did not endorse its purchase proposal. The appellant played a key role in the negotiating pavane and, thus, had the potential to influence (perhaps to dictate) the success or failure of CAS's business plan. A rational jury surely could have inferred that, given the circumstances, De Jesús-Toro and Quirós would have been apprehensive that noncompliance with the appellant's demands (such as his esurient terms for future employment at Pinnacle) would result in the foreclosure of a lucrative business opportunity. The plausibility of this inference was strengthened by Quirós's testimony that he had been considering a more experienced candidate for the Pinnacle in-house counsel position; that he had budgeted a lower wage for that post; but that he nonetheless "felt obliged" to hire the appellant at the more munificent salary that the appellant stipulated. In this regard, the jury reasonably could have thought that "fe[eling] obliged" was a euphemism for fearing the consequences of rejecting the appellant's demands.

To cinch matters, the events that transpired demonstrate beyond hope of contradiction that CAS's economic fear was reasonable. The appellant's initial opinion letter, which was unfavorable to CAS, attained the Secretary's endorsement. It was only when the appellant reversed field and revised his legal

-12-

opinion (which otherwise would have barred any direct sale) that a pathway opened for CAS's acquisition of the Hospital. The timing amply illustrates the salience of this about-face: the parties closed on the sale of the Hospital a scant three days after the appellant issued his revised opinion.

We hold, therefore, that the government provided sufficient evidence for the jury to conclude that the appellant was guilty of extortion induced by fear of economic loss. Cf. United States v. Doyle, 981 F.2d 591, 595 (1st Cir. 1992) (warning that "[o]ne would have to believe in the Tooth Fairy to think [a particular sequence of events] merely coincidental").

**2. Commerce**. In addition to establishing extortion, the government also must show that the extortionate conduct obstructed, delayed, or affected interstate or international commerce. See 18 U.S.C. § 1951(a). As to this prong, the case law erects a low threshold: a de minimis interference with commerce is enough to sustain a Hobbs Act conviction. See Vega Molina, 407 F.3d at 527.

The appellant advances two contentions in hopes of showing that the government failed to cross even this modest threshold. Neither contention is persuasive.

The appellant's principal argument is that there was no effect on interstate commerce because the money orders that he received were purchased by De Jesús-Toro personally. Since De Jesús-Toro earned his livelihood as a physician and only practiced

-13-

his profession in local hospitals, this thesis runs, an extortion of his funds could not have interfered with interstate commerce. This exercise in legal legerdemain does not withstand scrutiny.

While De Jesús-Toro bought the money orders, the record confirms that he first withdrew a sum equal to their cost — $35,000 — from a CAS account. He then used the appropriated funds to buy the money orders. Hence, the distinction between business and personal funds that the appellant relies on here is purely one of form, not of substance.

The jurisprudence of the Hobbs Act does not recognize that kind of artificial distinction. See, e.g., United States v. Devin, 918 F.2d 280, 293-94 (1st Cir. 1990) (finding an effect on interstate commerce when defendant had received money from the president of a corporation who, in turn, had derived the money from the coffers of the corporation — which was engaged in interstate commerce). A temporary interval of personal possession may serve to weaken the causal connection between funds and interstate commerce, but that connection remains strong enough to forge the necessary link — a de minimis effect on interstate commerce. See id. at 293.

The appellant's fallback argument is that the government failed to prove that any of CAS's funds entered into the stream of interstate commerce. This argument comprises little more than whistling past the graveyard. The government establishes a

cognizable effect on interstate commerce if it shows that the extortionate conduct depleted the assets of a business engaged in interstate commerce. See United States v. Rodríguez-Casiano, 425 F.3d 12, 15 (1st Cir. 2005) (upholding a finding of an effect on interstate commerce where money stolen in housebreaks belonged to businesses — a hardware store and a gas station, respectively — that purchased products out of state).

That principle is determinative in the instant case. The government adduced evidence showing that the money orders the appellant accepted could be traced to a CAS account; that CAS managed, and later owned, the Hospital; and that the Hospital bought much of its equipment from the United States mainland. This evidence formed a sufficient predicate for an inference that any payments that depleted CAS's assets affected interstate commerce.

To sum up, we conclude, without serious question, that the government provided adequate proof to establish both of the elements needed to ground convictions on the Hobbs Act counts: the commission of extortion and a concomitant interference with interstate commerce.

### B. **Counts 3 and 4**.

The appellant's second claim of error stands or falls on the merits of the appellant's first claim of error. The applicable money laundering statute, 18 U.S.C. § 1956, imposes criminal liability on any person who, "knowing that the property involved in

-15-

a financial transaction represents the proceeds of some form of unlawful activity," engages in a financial transaction that constitutes money laundering. Id. § 1956(a)(1). In fine, the statute requires proof of the commission of some antecedent offense (the specified "unlawful activity"), the avails of which are then "laundered" by the defendant. Here, the relevant counts in the indictment (counts 3 and 4) charged the extortion as the antecedent offense.

Seizing on this tiered statutory structure, the appellant claims, in effect, that the evidence was insufficient to support a finding of extortion and that, therefore, the absence of the linchpin predicate offense rendered the evidence insufficient to support his money laundering convictions. This claim is hopeless. After all, we already have rebuffed the appellant's challenge to the sufficiency of the evidence in connection with the extortion charges. See supra Part II(A). Consequently, his challenge to his money laundering convictions collapses of its own weight.

## C. **Variance**.

The appellant next complains that the verdict cannot stand on any of the four counts of conviction because it rests predominantly on facts that the government failed either to present to the grand jury or to plead in the indictment. We first sketch the background for this plaint and then address its merits.

In responding to a question on the verdict form, the petit jury found that the offenses of conviction involved $35,000. In the appellant's view, that calculation means that the jury found him liable only for the money orders that De Jesús-Toro passed along to him. But the government did not adduce any evidence about this alleged bribe before the grand jury; and the grand jury, in turn, did not mention the money orders in the indictment. Building on this foundation, the appellant argues that his convictions rest upon a prejudicial variance, thereby violating his rights under the Fifth, Sixth, and Fourteenth Amendments.

Though vigorously advanced, this argument lacks force. First and foremost, the fact that the jury found the appellant liable for $35,000 is by no means a conclusive indication that the money orders constituted the only evidence upon which the jury found him guilty. See, e.g., United States v. Casas, 425 F.3d 23, 64 n.56 (1st Cir. 2005) (stating that there is no foolproof way of telling what parts of the evidence the jury credited when it did not make specific findings on the overt acts alleged in the indictment). And even were we to assume, favorably to the appellant, the validity of his premise anent the money orders, the conclusion that he reaches would not follow.

A variance occurs "when the facts proved at trial differ from those alleged in the indictment." United States v. Fisher, 3 F.3d 456, 462 (1st Cir. 1993). Even if a variance occurs, however,

that fact alone does not suffice to displace a conviction. Rather, a variance requires that a conviction be set aside only when it is prejudicial, that is, when it affects the defendant's substantial rights. See United States v. Tormos-Vega, 959 F.2d 1103, 1115 (1st Cir. 1992); United States v. Fermin Castillo, 829 F.2d 1194, 1196 (1st Cir. 1987). There is no prejudicial variance so long as an indictment provides the defendant with sufficient detail to allow him to prepare a defense, avoid unfair surprise at trial, and plead double jeopardy when appropriate. See Tormos-Vega, 959 F.2d at 1115. The law recognizes that the government need not lay out the whole of its proof in the indictment. See United States v. Marrero-Ortiz, 160 F.3d 768, 773 (1st Cir. 1998).

That brings us to the case at bar. Here, the indictment limned the nucleus of operative facts giving rise to the charges against the appellant. It not only listed some overt acts referable to the charged conspiracies (e.g., it described the $15,000 payment that the appellant received and returned,[1] the Audi that De Jesús-Toro leased for him, and his cushy employment arrangement with Pinnacle) but also referred to the general agreement among CAS's shareholders that "De Jesús-Toro would take

---

[1]The appellant insists that his return of this payment conclusively demonstrates his innocence. In view of his subsequent receipt and retention of a larger sum, however, the jury was free to conclude that his return of the $15,000 payment may have had some other, less attractive explanation (say, a belief either that the amount was too paltry or that the source of the funds was too easily traced).

care of the payments to [the appellant]." Taken in the ensemble, these allegations served to put the appellant on notice that any pecuniary benefit he had received from or through De Jesús-Toro might be relevant to the government's case. See, e.g., United States v. Innamorati, 996 F.2d 456, 478 (1st Cir. 1993) (finding no prejudicial variance when an indictment charged a defendant with conspiring to distribute drugs and the government introduced proof of two deals not listed as overt acts because the evidence fell "squarely within the scope of th[e] alleged conspiracy").

In short, the indictment gave the appellant fair warning as to the nature of the charges that he faced and allowed him to defend intelligently against those charges. No more was exigible. Consequently, no variance (or, at the least, no prejudicial variance) occurred. See Marrero-Ortiz, 160 F.3d at 773.

**III. CONCLUSION**

We need go no further. For aught that appears, the appellant was fairly tried and justly convicted. His appeal, therefore, cannot prosper.


**Affirmed**.