**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 23-10669

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

SHARON BARNES SUTTON,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cr-00192-MHC-JKL-1

————————————

Before JILL PRYOR, NEWSOM, and LAGOA, Circuit Judges.

PER CURIAM:

Following a jury trial, Sharon Barnes Sutton was convicted of two counts of Hobbs Act extortion by wrongful use of fear of economic loss, in violation of 18 U.S.C. § 1951. She now appeals her conviction, raising four issues. First, Sutton argues that the

evidence was insufficient to sustain a conviction for Hobbs Act extortion.  Second, she argues that the Hobbs Act is unconstitutionally vague as applied here.  Third, she argues that the district court violated her constitutional right to present a complete defense by excluding psychiatric testimony.  And fourth, Sutton argues that the district court violated her constitutional confrontation right by limiting cross-examination of the victim, who was a key witness against her.

After careful review, and with the benefit of oral argument, we affirm Sutton's conviction.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Sharon Barnes Sutton was an elected member of the DeKalb County, Georgia, Board of Commissioners (the "Board") between 2008 and 2016.  The Board is made up of seven commissioners, and it takes a majority—four votes—for the Board to pass a resolution. In 2013, Sutton was a member of the Board's Finance, Audit, and Budget Committee, and she became the Chair of that committee in 2014.  Around that time, the Board was receiving bids from companies competing for a contract to provide construction management services in connection with the revamp of the County's wastewater treatment system, as required by a federal consent decree.  This project was known as the Snapfinger Creek Advanced Wastewater Treatment Plant Expansion Project (the "Snapfinger Project").

On July 16, 2013, after receiving a recommendation from the Finance, Audit, and Budget Committee, a majority of the Board

voted to award the contract to Tetra Tech, a global environmental engineering firm based in California. Sutton voted with the majority. The contract was for one year, and it automatically renewed each year for three years unless terminated by the Board.

In Tetra Tech's bid for the contract, it stated that it would use a subcontractor called Environmental Consortium, LLC. Reginald Veasley, the founder and president of Environmental Consortium, had previously worked for a different environmental consulting company owned by Barry Bennett, who was friends with Sutton. As a subcontractor, Environmental Consortium could receive up to $1.8 million from Tetra Tech over four years. This was Veasley's "first major contract" and a "life-changing event" for him and his family.

Prior to the Board's approval of the Tetra Tech contract, Sutton and Veasley had a "dinner meeting" where Sutton asked Veasley to add her friend Bennett to the subcontracting bid "before she went forward with her vote." Veasley spoke with Bennett, but the two of them decided against adding Bennett to the contract.

In May 2014, about a year after their dinner meeting and after the contract had been approved, Sutton and Veasley met again in the Board's lunchroom. There, Veasley explained why Bennett had not been added to his subcontractor bid. Sutton then wrote "500" on a notepad, slid it across the desk to Veasley, and mouthed the words "a month." Veasley was "shocked" and asked Sutton if it was a "good idea" to do this in front of everyone else in the room.

Sutton responded that she would "eat" the piece of paper with "500" written on it.

Veasley later mentioned this incident to his close friend Morris Williams, who was also Chief of Staff to the Board. Unbeknownst to both Veasley and Sutton, Williams was an FBI informant. Williams told the FBI about Veasley's encounter with Sutton, and Williams began to surveil and record Veasley and Sutton at the FBI's behest.

On May 21, 2014, Sutton and Williams met at a restaurant. According to Williams (who was wearing a wire), Sutton indicated to him that she had "requested some funds" from Veasley and that she wanted Williams to receive Veasley's payments on her behalf. Sutton told Williams that the arrangement was "clear" to Veasley. Sutton also complained about Bennett being left out of the Snapfinger Project, stating: "I figure if they don't want to deal with Barry, I understand righting a wrong, they still got to deal with me. Somebody does." The next day, in a recorded conversation, Williams told Veasley that Sutton was "under the impression you're going to give her $500 a month." Veasley responded by again recounting his encounter with Sutton in the lunchroom.

On June 2, 2014, Williams met Sutton at her house. Sutton asked Williams to put his phone in his trunk and to join her for a drive in her car. She asked Williams to accept payment from Veasley on her behalf because Veasley is "not in [her] life" and she "would never have a set reason to see [him]." Sutton said she did

not "want any problems," and Williams later testified that this meant Sutton did not "want to get caught."

On June 6, 2014, Veasley met Sutton at a Panera Bread. After their meal, they went into the parking lot, and Sutton's adult son, Brian, went to Veasley's vehicle, where Veasley gave Brian $500.

In early July 2014, Williams told Sutton that Veasley was "not comfortable" making payments to Brian. Sutton said she was "uncomfortable with sitting in a restaurant and [Veasley] handing her an envelope." She said she did not want to end up like another commissioner who had been caught taking a bribe in a restaurant. Sutton then told Williams to ask Veasley for $1,000. Williams, then, relayed this information to Veasley. Veasley told Williams he would not give Sutton $1,000 because he "d[i]dn't have money like that." Veasley said he had no problem telling Sutton this himself. A few days later, however, on July 28, 2014, Veasley made a second payment of $500 to Sutton at her home in Stone Mountain, Georgia.[1]

Following an FBI investigation, Sutton was indicted on May 15, 2019, for two counts of extortion by wrongful use of fear of economic loss, in violation of the Hobbs Act, 18 U.S.C. § 1951 (Counts One and Two), and for one count of bribery in violation of 18 U.S.C. § 666 (Count Three). Sutton pleaded not guilty.

---

[1] This was the last payment that Veasley made to Sutton before he found out that the FBI was investigating her, at which point he retained an attorney.

On December 7, 2021, Sutton filed a notice under Federal Rule of Criminal Procedure 12.2(b), which informed the district court of her intention to file psychiatric evidence related to her *mens rea*. Sutton filed testimony from Kristine Lokken, Ph.D., of Alabama Neurobehavior, LLC. The government filed a motion to exclude, primarily arguing that the testimony was barred by the Insanity Defense Reform Act of 1984 (IDRA). The district court granted the government's motion.

The parties proceeded to trial. During his direct examination, Veasley testified that, after Sutton wrote "500" on the notepad and handed it to him, she mouthed the words "a month." Veasley said he understood this to mean that "[s]he wanted [him] to pay her $500 a month." On cross-examination, Sutton's defense counsel sought to show Veasley a transcript of his grand jury testimony to impeach him, because, according to Sutton's counsel, Veasley never expressly told the grand jury that Sutton wanted him to pay her $500 a month. After a sidebar request and objection by the government, the district court prohibited Sutton's defense counsel from showing the grand jury testimony to Veasley. The district court reasoned that Veasley was never asked before the grand jury "whether [Sutton] specifically mouthed the word 'month' or not, [and] there's nothing in [the transcript] that even deals with that." The court added: "I mean, what you're basically saying is he didn't volunteer this for the grand jury. But he wasn't asked the question. You can't impeach him with what he wasn't asked."

On October 31, 2022, before the jury's verdict, Sutton moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 on the grounds of insufficient evidence and unconstitutional vagueness regarding the Hobbs Act as applied here. The district court denied the motion. The jury subsequently found Sutton guilty of Counts One and Two and acquitted her of Count Three.

On November 16, 2022, Sutton filed a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(c), which the district court denied. The district court then sentenced Sutton to three years of probation, a $200 special assessment, and a $3,000 fine. Sutton timely appealed.

## II.    STANDARDS OF REVIEW

The district court's decision on a Rule 29 motion receives no deference by this Court, and our review of the denial of a defendant's motion for acquittal is *de novo*. *United States v. Grigsby*, 111 F.3d 806, 833 (11th Cir. 1997) (citing *United States v. Taylor*, 972 F.2d 1247, 1250 (11th Cir. 1992)).

We review *de novo* challenges to the sufficiency of the evidence for criminal convictions. *United States v. Ostrander*, 114 F.4th 1348, 1366 (11th Cir. 2024). All evidence is viewed in the light most favorable to the government, and we draw all reasonable inferences and credibility choices in favor of the jury's verdict. *See id.* "'[A]ny reasonable construction of the evidence' that 'would have allowed the jury to find the defendant guilty beyond a reasonable doubt' is sufficient to meet this standard." *Id.* (quoting *United States*

*v. Herrera*, 931 F.2d 761, 762 (11th Cir. 1991) (alterations original)). "[W]e need not exclude every reasonable hypothesis of innocence or find the evidence wholly inconsistent with every conclusion except that of guilt, provided that a reasonable factfinder could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Kelly*, 888 F.2d 732, 740 (11th Cir. 1989), *holding modified by United States v. Toler*, 144 F.3d 1423 (11th Cir. 1998). "Where the government relies on circumstantial evidence, 'reasonable inferences, and not mere speculation, must support the jury's verdict.'" *United States v. Klopf*, 423 F.3d 1228, 1236 (11th Cir. 2005) (quoting *United States v. Perez–Tosta,* 36 F.3d 1552, 1557 (11th Cir. 1994)). Unless no reasonable jury could have found Sutton guilty beyond a reasonable doubt, we will affirm the conviction. *See Ostrander*, 114 F.4th at 1366.

### III.    ANALYSIS

Sutton asks us to reverse her conviction for four reasons: (1) that the evidence was insufficient to convict her of Hobbs Act extortion under § 1951, (2) that § 1951 is unconstitutionally vague as applied to her conduct, (3) that the district court's exclusion of expert psychiatric testimony violated her right to present a defense, and (4) that the district court violated her Sixth Amendment rights by prohibiting her from impeaching a witness with a transcript of

his grand jury testimony.  We begin with sufficiency of the evidence.

## A. Sufficiency of the Evidence

### 1. *Sutton intended to exploit Veasley's fear.*

As part of her argument that the government offered insufficient evidence that she committed Hobbs Act extortion, Sutton contends that the record is "devoid of any evidence" that she knew that Veasley harbored any fear or that she did anything to exploit that fear.  As support, Sutton insists that she "never made a direct or implicit threat of any kind."  Had she "ever made or even intimated such a threat," Sutton adds, "surely Veasley or Williams would have testified about it."  She further argues that there was no evidence "that [she] connected the money to any current contract or even to any future work by Veasley."  We reject these arguments.

Under the Hobbs Act, "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion or attempts or conspires so to do, . . . shall be fined under this title or imprisoned not more than twenty years, or both."  18 U.S.C. § 1951(a).  "[E]xtortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  *Id*. § 1951(b).  "Fear means 'a state of anxious concern, alarm[,] or apprehension of harm.'"  *United States v. Harris*, 916 F.3d 948, 958 (11th Cir. 2019) (alteration in original) (quoting *United States v. Bornscheuer*, 563 F.3d

1228, 1236 (11th Cir. 2009)).  Fear "includes 'fear of economic loss as well as fear of physical violence.'"  *Id.* (quoting *Bornscheuer*, 563 F.3d at 1236).

To be convicted of Hobbs Act extortion by wrongful use of fear of economic loss, "[t]he defendant does not need to have caused the fear; the statute is satisfied if he or she intended to exploit the fear." *United States v. Haimowitz*, 725 F.2d 1561, 1572 (11th Cir. 1984).  "Subtle extortions are covered under the Hobbs Act, and the government satisfie[s] its burden of proof if it show[s] circumstances surrounding the alleged extortionate conduct that rendered the victim's fear of threatened loss reasonable." *United States v. Sander*, 615 F.2d 215, 218 (5th Cir. 1980). [2]

To begin with, Sutton's contention that she "never made a direct or implicit threat of any kind" is irrelevant, because our precedent is clear that the "fear experienced by the victim" under § 1951 "does not have to be the consequence of a direct threat." *Haimowitz*, 725 F.2d at 1572.  In fact, "[t]he defendant does not need to have caused the fear" at all; "the statute is satisfied if he or she intended to exploit the [victim's] fear." *Id.*

And here, we think the circumstantial evidence was sufficient for the jury to have inferred that Sutton knew about and intended to exploit Veasley's fear of losing his financial benefit from

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

the contract. The evidence shows (1) that Sutton knew Veasley was a subcontractor for the Snapfinger Project, since she asked him to add Bennett to his bid, (2) that Sutton asked Veasley for "500" in a conversation about the Snapfinger Project, and (3) that Sutton said in a discussion about Veasley and the Snapfinger Project: "[I]f they don't want to deal with [Bennett], I understand righting a wrong, you [Williams] do too, they still got to deal with me. Somebody does." The government also showed at trial that there was "an incongruous power balance that existed at the time" that Sutton made a demand of Veasley: Sutton was a commissioner with the power to cancel the contract, her request for money was tied to that contract, and Veasley was economically dependent on the contract. Indeed, Sutton now concedes that "the facts of this case might show that [she] perhaps should have known that her request for $500 from Veasley put him in an uncomfortable situation, or that he might be in fear or even that he might think that she would exploit her power to hurt him if he did not pay."

In light of this "incongruous power balance" and based on the evidence at trial, we think the jury could reasonably infer that Sutton's request for $500 a month in a conversation about the Snapfinger Project was an extortion demand. Sutton was one of seven commissioners who could terminate the project contract, so a subcontractor like Veasley might feel the need to placate Sutton, especially with "life-changing" money on the line. That Sutton intended to exploit Veasley's fear could also be inferred from her making her request in a secretive manner (by sliding a notepad with "500" written on it across the desk and mouthing "a month"),

and by her statement that "they still got to deal with me." *See Sander*, 615 F.2d at 219 (affirming conviction under § 1951 where the victim's "belief that payment of the money would prevent the feared economic injury [was] reasonable in light of the surrounding circumstances," the facts "show[ed] that [the victim] faced a potential loss of millions of dollars, and Sander's threat of economic loss, at least indirectly . . . induced [the victim] to part with the money to prevent such threatened economic loss").

Sutton's statements that Veasley was "not in [her] life," and that she "would never have a set reason to see [him]" are also "circumstances surrounding the alleged extortionate conduct that rendered the victim's fear of threatened loss reasonable." *Id*. at 218. Sutton made these comments to explain to Williams why she wanted Williams to relay Veasley's money to her—because Sutton had no relationship with Veasley. Sutton had no reason to give Veasley any favors or benefits, and Veasley had no reason to expect the same. The more logical inference, we think, is that Sutton asked Veasley for payments to stave off reprisal, as the Tetra Tech project was already approved for four years *unless* the Board acted to cancel it. Thus, because the contract was set unless action was taken to undo it, and because the only thing Sutton could do once it was approved was cancel its automatic renewal, we think the evidence supports the inference that Sutton asked Veasley for money in exchange for not taking action against him.

We have upheld the inference of extortion by wrongful use of fear of economic loss in circumstances in which there was a

request for money without a direct or indirect threat. *See United States v. Duhon*, 565 F.2d 345, 352 (5th Cir. 1978) (affirming conviction for extortion where there was sufficient evidence to support the jury's conclusion and explaining that "[t]he avoidance of explicit demands for personal payoffs and threats of adverse consequences if the payment is not made cannot in themselves save a defendant from a jury determination that he intended to extort"); *see also United States v. DeMet*, 486 F.2d 816, 820 (7th Cir. 1973) (noting that "the jury could reasonably infer from all the circumstances, including defendant's official position, that [the victim] was in fear of harm to his business, his fear was reasonable, and defendant exploited it to extort money and liquor" when the defendant police officer offered to make parking enforcement problems go away in exchange for payments).

Similarly, in *United States v. Flynt*, 15 F.3d 1002, 1003–04 (11th Cir. 1994), we held that a jury could have found extortion in the following situation: The defendant, who was the traffic manager for a K-Mart distribution center, mentioned his lack of money and his desire for money or certain properties several times to the owner of a trucking company that largely serviced the distribution center; the trucking company owner subsequently gave the defendant money or property; and the trucking company owner claimed that he did this because he feared losing business. The defendant never directly or indirectly threatened the trucking company owner, but the threat implicit in the circumstances was understood and exploited.

Here, Veasley testified that he was "[a]fraid of [Sutton's] retaliation, that he felt "pressed into a corner," and that he believed he could "lose lots"—his "greatest opportunity for [him] to . . . make a way for [his] family"—if Sutton retaliated. Veasley did, in fact, make two payments of $500 to Sutton, which, under the circumstances here, can reasonably be interpreted to mean that Veasley was fearful of economic loss. *See, e.g.*, *United States v. Rivera Rangel*, 396 F.3d 476, 483 (1st Cir. 2005) ("The fact that Ventura reluctantly agreed to pay Rivera an additional $1,500 per month in 1999 further supports the finding that Ventura acted out of a fear of economic loss.").[3]

Finally, just because Sutton took no actions against Veasley after he refused to pay $1,000 rather than $500, and after he stopped making payments once the FBI approached him, does not mean that Sutton did not exploit Veasley's fear. Threats are still threats, even if they are fake or not actually carried out. *Cf. Haimowitz*, 725 F.2d at 1572 ("The fact that Abbott had begun cooperating with federal authorities when he paid the $7,500 does not support defendant's position that Abbott could not be the victim of

---

[3] Sutton argues that "any subjective fear" on Veasley's part was "objectively unreasonable." Sutton points to the fact that Veasley told Williams that he would not pay Sutton $1,000 as opposed to $500, and that he had no problem telling Sutton this himself. But this fact does not show that Veasley's fearfulness was "objectively unreasonable." It is undisputed Veasley still paid Sutton $500 *after* her demand for $1,000, which he says he did not want to do. Given the other credible evidence suggesting that Veasley was economically fearful, we defer to the jury's reasonable interpretation of the facts.

extortion."); *United States v. Quinn*, 514 F.2d 1250, 1267 (5th Cir. 1975) ("The Hobbs Act forbids attempted extortion as well as actual extortion. Therefore, in a case where the F.B.I. foils the actual offense, it is possible for one to commit attempted extortion."). *Cf. United States v. Hyde*, 448 F.2d 815, 834 (5th Cir. 1971) ("The fact that relations between the victims and the extorters were often cordial is not inconsistent with extortion. Knowing that they were at the mercy of the Attorney General's office, it is a fair inference that the victims felt that to save their businesses they had to keep the extorters satisfied."); *DeMet*, 486 F.2d at 820 ("[F]ear may be present even if confrontations between the victim and the alleged extorter appear friendly.").

Therefore, we conclude that the evidence was sufficient for a reasonable jury to find that Sutton intended to exploit Veasley's fear of economic loss.

2. *Veasley feared the loss of both an existing financial interest and future business opportunities.*

Sutton's second argument on sufficiency is that "[a]ny fear of a financial loss had to be regarding some thing which Veasley already had, rather than a possible future interest."

Again, we disagree. True, Veasley testified that he was unaware of the auto-renewal provision in the contract between DeKalb County and Tetra Tech, so he may have understood the following year's contract as only a possible future benefit. As the government correctly states, though, Sutton's distinction between the denial of a possible future benefit and the loss of a current one is not

supported by this Court's case law.  This Court has affirmed convictions in Hobbs Act cases involving possible future benefits.  In *Haimowitz*, for example, the defendant extorted money from a victim seeking to obtain a liquor license he did not already have, 725 F.2d at 1572, and the defendant even told the victim that "his money would be returned" if the extortionists were "not able to obtain the permanent liquor license," *id.* at 1567.  In *Flynt*, the defendant extorted money from a victim who "knew [the defendant] controlled the level of business" that could flow to the victim's trucking company and who was afraid of losing that future business.  15 F.3d at 1004.  Our sister circuits have similarly upheld § 1951 convictions based on threats of possible future economic loss.  *See United States v. Cruzado-Laureano*, 404 F.3d 470, 481 (1st Cir. 2005) ("Extortion by 'fear' can mean fear of economic loss, including the possibility of lost business opportunities."); *United States v. Cruz-Arroyo*, 461 F.3d 69, 74–75 (1st Cir. 2006) (upholding conviction based on "foreclosure of a lucrative business opportunity"); *United States v. Robinson*, 700 F.2d 205, 208–09 (5th Cir. 1983) (upholding conviction based on promised future contract).

In any event, as the district court also pointed out, there was testimony at trial suggesting that Veasley was fearful of losing his *existing* contract for the Snapfinger Project.  For example, he testified that he knew commissioners could vote against the renewal of the Snapfinger contract, and that if Sutton "went against [him]," she could "kill [him] on" both his current contract and future ones.  We thus find no merit to this argument.

### 3. *Veasley reasonably believed that Sutton could retaliate against him and would take action against him.*

Finally, Sutton argues that "[i]t was not reasonable for Veasley to believe that [she] unilaterally had the power to cancel the Tetra Tech contract," nor was it reasonable for Veasley to "believe that [she] would take any action to cancel the . . . contract." Sutton claims that the Board was split 2-2-2 and that the CEO would have to respond to revoke the contract, so Sutton could not terminate the contract herself. Additionally, she tells us that Veasley "never testified that he *actually believed* that she would take any retaliatory actions if he did not pay her." She adds that Veasley's supposed source for inside information, Morris Williams, who was secretly an FBI important, "told [Veasley] [his fear] was unreasonable." And she argues that Veasley simply wanted her favor for future projects.

We conclude that there was sufficient evidence for the jury to find that Veasley reasonably believed Sutton had enough power to harm him economically. Whether Sutton actually had the power to harm Veasley economically is irrelevant. Instead, what matters is Veasley's reasonable fear that Sutton could cause him economic harm. *See Robinson*, 700 F.2d at 209 ("Robinson also argues that the evidence is legally insufficient, urging that he had no actual power to control the bidding or award the contract. But more critical to an extortion attempt under the Hobbs Act is the reasonable belief of Braden that he would suffer economic harm if he failed to cooperate with Robinson."); *United States v. Brown*, 540 F.2d 364, 373 n.6 (8th Cir. 1976) ("A defendant need not be shown

to have actual ability to produce anticipated harm, however, as long as the victims reasonably believe such harm may result through the acts of defendant."), *abrogated on other grounds by Dalton v. United States*, 862 F.2d 1307 (8th Cir. 1988).

Sutton and the government spend much time arguing about whether termination of the Snapfinger Project contract would require the CEO's approval and whether the board of commissioners (absent the CEO) was split 2-2-2 or 3-3. But these intricacies of local politics are beside the point. The question is whether "the government [was able to] show circumstances surrounding the act of extortion that render[ed] the victim's fear reasonable," *United States v. Kopituk*, 690 F.2d 1289, 1328 (11th Cir. 1982), and the evidence points to that here.

Veasley knew that Sutton was one of seven commissioners with a powerful vote. The evidence also shows that Sutton was in a unique position to influence her colleagues, having recommended the contract as a member of the Finance, Audit, and Budget Committee in the first place, and later serving as Chair of that committee. Veasley paid Sutton even though he did not want to, and the only reason to do so would be to avoid expected reprisal. Veasley testified that he was aware that "any commissioner" could "vote against" the renewal of the Snapfinger Project, and that he was "afraid of [ ] retaliation" and losing everything he had to "gain moving forward." Veasley also testified that he feared Sutton would "kill" the Snapfinger Project contract, and Sutton's argument that Veasley did not actually mean this is not supported by

any evidence.  We think this is enough.  *See United States v. Rivera Rangel*, 396 F.3d 476, 483–84 (1st Cir. 2005) ("[G]iven Rivera's access to, and influence over, the officials who decided whether to grant the permits Ventura needed, we cannot say that Ventura's fear was unreasonable.").

We thus conclude that the evidence before the jury was sufficient to sustain Sutton's convictions for Hobbs Act extortion.

## B.  The Hobbs Act Is Not Unconstitutionally Vague as Applied to Sutton's Conduct

We next turn to Sutton's argument that the Hobbs Act is unconstitutionally vague as applied to Sutton's conduct.  This Court "review[s] whether a criminal statute is unconstitutionally vague *de novo*."  *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010).  "A criminal statute will violate due process if it 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or 'it authorizes or even encourages arbitrary and discriminatory enforcement.'"  *Id.* at 1347 (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  "Objections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk."  *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).  "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis."  *Id.*  "'[S]tatutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain

20                    Opinion of the Court                    23-10669

marginal offenses fall within their language,' and there is a strong presumption supporting the constitutionality of legislation." *United States v. Duran*, 596 F.3d 1283, 1290 (11th Cir. 2010) (quoting *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)).

On appeal, Sutton argues that "Hobbs Act extortion by fear of economic loss is so vague that it did not give [her] fair warning that her conduct was wrongful." Alternatively, Sutton argues that the district court should have applied the related rule of lenity.

As discussed above, the evidence at trial was sufficient to support a jury finding that when Sutton demanded payment from Veasley, she intended to exploit Veasley's reasonable fear of financial loss. Because this Court has long held that fear of economic loss is covered by the Hobbs Act, an ordinary person is thus on notice that the conduct here falls squarely within the scope of the Act.

Moreover, criminalizing extortion by fear of economic loss is not a novel interpretation of the Hobbs Act for which Sutton lacked notice. Rather, our precedent has clearly established that "[f]ear of economic loss is a type of fear within the purview of § 1951 [and] [t]he defendant does not need to have caused the fear; the statute is satisfied if he or she intended to exploit the fear." *Haimowitz*, 725 F.2d at 1572. These judicial glosses satisfy the

23-10669                Opinion of the Court                21

notice requirement under the Due Process Clause. *See United States v. Lanier*, 520 U.S. 259, 266 (1997).[4]

Sutton essentially claims that, if she is guilty, it is because she stumbled into criminal activity unawares. But the Supreme Court has held that a scienter requirement can vitiate vagueness concerns. *See Screws v. United States*, 325 U.S. 91, 102 (1945) ("The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware."). Since the jury found that Sutton "knowingly" extorted money, Sutton did not stumble into this crime. Instead, she knew that she was exploiting Veasley's fear of economic harm, and that's exactly what the Hobbs Act forbids.

Lastly, Sutton's argument that the rule of lenity should apply is without merit. The rule of lenity applies only when statutes are still ambiguous after a court has exhausted all other means of interpretation. *See Chapman v. United States*, 500 U.S. 453, 463 (1991). Because the Hobbs Act as applied here is not ambiguous under the Due Process Clause, this argument fails. We thus conclude that

---

[4] The Eighth Circuit has even held that extortion by fear of economic loss is part of the statute's ordinary meaning. *Bianchi v. United States*, 219 F.2d 182, 189 (8th Cir. 1955) ("We see no reason why 'fear' as used in the extortion statute should not be given its ordinary meaning. It is a simple and well understood word. . . . We conclude that 'fear' as defined in the extortion section of the Anti-Racketeering Act should be given its ordinary meaning, and consequently 'fear' would include fear of economic loss.").

the Hobbs Act provision criminalizing extortion by wrongful use of fear of economic loss is not void for vagueness under the Due Process Clause as applied to Sutton's conduct.

### C.  The Exclusion of Expert Testimony Did Not Violate Sutton's Right to Present a Complete Defense

Next, Sutton argues that the district court abused its discretion in excluding Dr. Lokken's expert testimony and that the ruling deprived Sutton of her right to present a complete defense.  She argues that Dr. Lokken's testimony would have shown "that [her] seemingly criminal behavior could equally be explained by reference to physical medical issues and the impact that they had on her cognition at the time."

This Court reviews a district court's decision on the admissibility of psychiatric evidence for abuse of discretion.  *United States v. Westcott*, 83 F.3d 1354, 1357 (11th Cir. 1996).  "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures[,] . . . or makes findings of fact that are clearly erroneous."  *Ochoa v. United States*, 45 F.4th 1293, 1298 (11th Cir. 2022) (quoting *Winthrop-Redin v. United States*, 767 F.3d 1210, 1215 (11th Cir. 2014)), *cert. denied*, 143 S. Ct. 1024 (2023).  We review *de novo* "[w]hether the exclusion of evidence violated a constitutional guarantee."  *United States v. Sarras*, 575 F.3d 1191, 1209 n.24 (11th Cir. 2009).

We conclude that the district court did not abuse its discretion by excluding Dr. Lokken's testimony and did not violate Sutton's constitutional right to present a complete defense.

Under the Insanity Defense Reform Act of 1984 (IDRA), "[i]t is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). "Mental disease or defect *does not otherwise constitute a defense*." *Id.* (emphasis added).

We have interpreted the IDRA "to preclude only the use of 'non-insanity' psychiatric evidence that points toward 'exoneration or mitigation of an offense because of a defendant's supposed psychiatric compulsion or inability or failure to engage in normal reflection.'" *United States v. Cameron*, 907 F.2d 1051, 1066 (11th Cir. 1990) (quoting *United States v. Pohlot*, 827 F.2d 889, 890 (3d Cir. 1987)). Such inadmissible psychiatric evidence includes "any form of legal excuse based upon one's lack of volitional control," such as "a diminished ability or failure to reflect adequately upon the consequences or nature of one's actions." *Id.* at 1061. "When a defendant claims to have psychiatric evidence that she 'lacked the capacity' or was 'incapable' of forming the intent necessary for the crime charged, most often that defendant is speaking of an incapacity to reflect or control the behaviors that produced the criminal conduct." *Id.* at 1066. "Congress distinguished such evidence from 'psychiatric evidence to negate specific intent' and did not intend

to exclude the latter in all instances." *Id.* (quoting *United States v. Gold*, 661 F. Supp. 1127, 1131 (D.D.C. 1987)).

Thus, psychiatric evidence can be used in only two ways: (1) as a true insanity defense, or (2) as evidence that the defendant lacked specific intent. The critical distinction is between evidence of the defendant's intent (which is admissible) and evidence of the defendant's *self-awareness* of his intent, motivations, consequences of his actions, etc. (which is inadmissible). *See id.* at 1066 n.30.

"Because psychiatric evidence (1) will only rarely negate specific intent, (2) presents an inherent danger that it will distract the jury[] from focusing on the actual presence or absence of *mens rea*, and (3) 'may easily slide into wider usage that opens up the jury to theories of defense more akin to justification,' district courts must examine such psychiatric evidence carefully to ascertain whether it would, if believed, 'support a *legally acceptable* theory of lack of *mens rea.*'" *Id.* at 1067 (quoting *Pohlot*, 827 F.2d at 905–06).

The district court excluded Dr. Lokken's testimony for two independent reasons. First, the district court concluded that Dr. Lokken's testimony "fails to explain how any alleged cognitive impairment with Sutton's attention to detail, visual organization, and planning negate [*sic*] the specific intent of the extortion and bribery crimes." We agree. Second, the district court concluded that her testimony "fail[ed] to demonstrate that any alleged cognitive deficiency identified in Dr. Lokken's 2021 testing was present in 2014 such that it negated Sutton's *mens rea* at the time of the alleged crimes." Because we find the first reason sufficient, we need not

reach the second. We conclude that the district court did not abuse its discretion by excluding Dr. Lokken's testimony.

We conclude that this exclusion did not violate Sutton's Fifth and Sixth Amendment right to present a complete defense either. "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). However, in *Clark v. Arizona*, the Supreme Court permitted the categorical exclusion of psychiatric evidence due to concerns about "confusion and misunderstanding [on the element of mens rea] on the part of jurors." 548 U.S. 735, 764, 779 (2006); *see also United States v. Litzky*, 18 F.4th 1296, 1305 (11th Cir. 2021) (applying *Clark* to uphold the exclusion of psychiatric testimony). Since the same concerns are present with Dr. Lokken's testimony, we conclude that the district court did not violate Sutton's constitutional right to present a complete defense by excluding the testimony.

## D. The District Court Did Not Abuse its Discretion in Limiting Cross-Examination

Finally, Sutton contends that the district court erred by precluding her from impeaching Veasley "by omission" using his grand jury testimony. Sutton argues that "[i]t was essential to the theory of the defense that Veasley . . . was not credible in his testimony regarding his fear." To demonstrate that Veasley was not credible, Sutton wanted to confront Veasley with his grand jury testimony to show that he "was asked a broad question" before the

grand jury—namely, "How did [Sutton] make the request?"—and that he omitted the fact that Sutton mouthed "a month." Sutton claims that Veasley's omission supports her argument that she actually did not mouth "a month," and that Veasley is not a credible witness overall.

The government retorts that Veasley's "omission" was not inconsistent with his later statements because he was never asked (before the grand jury) about Sutton's demand with regard to the regularity of payments. Regardless, Sutton was allowed to ask Veasley about his omission; "[t]he only thing that Sutton was prevented from doing was showing Veasley his grand jury testimony while she asked those questions."

We "review[] limitations on the scope of cross-examination for 'a clear abuse of discretion.'" *United States v. Rushin*, 844 F.3d 933, 938 (11th Cir. 2016) (quoting *United States v. Maxwell*, 579 F.3d 1282, 1295 (11th Cir. 2009)); *see also United States v. Hands*, 184 F.3d 1322, 1326 (11th Cir. 1999) (reviewing a challenge to impeachment evidence), *corrected on other grounds*, 194 F.3d 1186 (11th Cir. 1999). "[W]e address *de novo* the question of whether a defendant's Sixth Amendment rights were violated." *Rushin*, 844 F.3d at 938.

We conclude that the district court did not abuse its discretion in limiting defense counsel's cross-examination of Veasley or

23-10669                Opinion of the Court                27

in precluding admission of Veasley's grand jury testimony.[5] And even if it did, the error would have been harmless.

"[A] defendant can only cross-examine a prosecution witness if 'the information sought to be elicited [is] relevant.'" *Maxwell*, 579 F.3d at 1296 (quoting *United States v. Diaz*, 26 F.3d 1533, 1540 (11th Cir. 1994)) (first alteration added, second alteration original). "Additionally, '[o]nce there is sufficient cross-examination to satisfy the Sixth Amendment's Confrontation Clause, further questioning is within the district court's discretion.'" *Id.* (quoting *United States v. Garcia*, 13 F.3d 1464, 1468 (11th Cir. 1994)). "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *Garcia*, 13 F.3d at 1469.

A prior omission can be a proper subject for impeachment. *See Jencks v. United States*, 353 U.S. 657, 667 (1957) ("The omission from the reports of facts related at the trial, or a contrast in emphasis upon the same facts, even a different order of treatment, are also relevant to the cross-examining process of testing the credibility of

---

[5] If the issue is excluded impeachment evidence rather than excluded cross-examination questioning, the standard of review and analysis remains the same. *See Hands*, 184 F.3d at 1327–28 ("Otherwise irrelevant evidence sometimes may be admissible when used to impeach a witness's testimony . . . . In this case, however, the entire line of questioning, beginning with the government's query as to the permit revocation, was irrelevant; the government could not bootstrap irrelevant evidence into the trial by using it to impeach the answers to irrelevant questions.").

a witness' trial testimony."); *Castillo v. United States*, 409 F.2d 762, 765 (5th Cir. 1969) ("The omission from the statements were, of course, proper subject for impeachment of the agent, and the defense employed the statements for that purpose."). But an omission is relevant, and, thus, is a proper subject for impeachment, only if the omitted information is inconsistent with the witness's later testimony. Omitted information is inconsistent only if the witness would have been expected to reveal the information in the normal course of events. *See Jenkins v. Anderson*, 447 U.S. 231, 239 (1980) ("Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted. Each jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative. For example, this Court has exercised its supervisory powers over federal courts to hold that prior silence cannot be used for impeachment where silence is not probative of a defendant's credibility and where prejudice to the defendant might result."); *United States v. Stock*, 948 F.2d 1299, 1301 (D.C. Cir. 1991) ("Prior statements that omit details covered at trial are inconsistent if it would have been 'natural' for the witness to include them in the earlier statement." (citing *Jenkins*, 447 U.S. at 239.)); *United States v. Meserve*, 271 F.3d 314, 320–21 (1st Cir. 2001) ("Prior statements, such as the grand jury testimony at issue here, that omit details included in a witness's trial testimony are inconsistent if it would have been 'natural' for the

witness to include the details in the earlier statement." (citing *Stock*, 948 F.2d at 1301.)).

As the district court found, Veasley was not directly asked about the regularity of payments during his grand jury testimony. Witnesses do not always volunteer every detail in response to every question, and there is a benign explanation for why Veasley would not have done so here—because the most specific part of Sutton's request was the amount (which was dramatically conveyed by sliding a note across the table in a public setting), and because the regularity of payments could be seen as a mere detail.

But even if the district court did abuse its discretion, reversal and remand is not required if the error is harmless beyond a reasonable doubt. *See Maxwell*, 579 F.3d at 1298. "In making this determination, a 'host of factors' are to be considered, including 'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *United States v. Lankford*, 955 F.2d 1545, 1552 (11th Cir. 1992) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986)).

Here, we conclude that any error would be harmless beyond a reasonable doubt. First, Sutton was allowed to question Veasley about his purported earlier omission and was only prevented from showing Veasley his grand jury testimony. Second, Veasley's trial testimony that Sutton mouthed "a month" is not a *sine qua non* of

the government's case because there is other evidence that Sutton did mouth "a month," including evidence from Veasley himself. In Gov. Ex. 13, Veasley was told by Williams that Sutton understood that she and Veasley had agreed to $500 a month, and Veasley said, "Okay" and did not dispute it. Additionally, in Gov. Ex. 15, Williams and Sutton discussed a *second* payment from Veasley, suggesting that Sutton did ask for monthly payments. Third, as previously discussed, there was sufficient evidence for the jury to find Sutton guilty. Given the insignificance of Veasley's statement at issue and the corroboration of Veasley's trial testimony by audio recordings, any error on this issue would not make a meaningful difference in the strength of the government's case.

Lastly, there was no violation of Sutton's Confrontation Clause rights. "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *Garcia*, 13 F.3d at 1469. Veasley's omission reasonably could be seen as a mere detail, and other evidence supports Veasley's testimony that Sutton asked for monthly payments, which supports Veasley's general credibility. Accordingly, the jury would have received no significantly different impression of Veasley's credibility had Sutton's defense counsel shown him his grand jury testimony. Defense counsel was able to question Veasley about his earlier testimony anyway. We thus conclude that no constitutional error occurred.

## IV.    CONCLUSION

Accordingly, for the reasons stated, we affirm Sutton's convictions and sentence.

**AFFIRMED.**